UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ISSAM ELNADDAF<br><br>Defendant | Criminal No. 13-CR-10289-DPW |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The United States of America, by Andrew E. Lelling, United States Attorney, and Nadine Pellegrini, Assistant United States Attorney for the District of Massachusetts, opposes the Defendant's Motion to Dismiss based upon a violation of his constitutional right to a speedy trial. Application of the four-part balancing test set forth in *Barker v. Wingo*, 407, U.S. 514 (1972) does not provide a basis for relief for the defendant. The basis for the government's opposition is set forth as follows:

1. **The length of time.**

The government agrees that the length of time in this matter is correctly calculated from the date of the initial indictment, September 26, 2013, until the date arrest of the Defendant upon his return from Lebanon to the United States on June 4, 2018. The government also agrees that the period of 56 months raises the specter of presumptive prejudice; however, the government does not agree that the length of time has the final say. The passage of time simply initiates the inquiry into the remaining factors set forth in *Barker*; those being, reasons for the delay; assertion of the right to a speedy trial; and prejudice. Id. at 530 (1972).

The government suggests that the presumption of prejudice attaching to the length of time should be viewed as a rebuttable one. In this case, rebuttal of the presumption is supported by a more fulsome examination of the facts surrounding each of the remaining *Barker* factors and by a more exacting analysis of those factors. Reliance upon fact patterns in other cases does not assist in this inquiry. "A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." *Barker*, 407 U.S. at 530. Moreover, in performing the balancing test "…the conduct of both the prosecution and the defendant are weighed." *Id.*

**II. Reason for the Delay**

Defendant attempts to frame this focal inquiry based upon a claim that the Defendant was easy to locate ("he lived openly in Lebanon with his family; he registered "his presence with the American Embassy in Beirut"; "he conducted business with an American company.") [Def. Mem. P. 6]. In doing so, Defendant wrongly suggests that the United States did not attempt to locate him ("the defendant is unaware of any efforts at all by the government to locate him.") Id. Defendant misapprehends the issue regarding the delay in two ways: (1) the government does not rely upon any claim of ignorance of the Defendant's location and/or that its alleged lack of knowledge was responsible for the delay and; (2) the Defendant fails to address the pivotal question: what was his status in Lebanon and how does that fact affect the analysis of whether or not the government was wholly responsible for the delay.

It is true that the government did not immediately know the final destination of the Defendant upon his leaving the United States in January of 2013. The government was able to determine that the Defendant flew from the United States to London based upon his use of his United States passport. Thereafter, the government was not immediately able to track his movements after London due to the Defendant's use of a Lebanese passport to travel.

The government takes issue with the Defendant's contention that there was a "failure" to contact the Defendant's brother-in-law and such amounted to egregious failure to investigate. The government learned from another source that the Defendant was in Lebanon. Defendant's whereabouts directly affected the ability of the government to bring him to trial. By voluntarily entering and remaining in a country from which there was no extradition, expulsion, or deportation, Defendant put himself beyond the reach of the government.

**A. Extradition**

The government understands that, in many cases involving a defendant in a foreign jurisdiction, it cannot simply wait and hope for the Defendant to return to the United States. However, that analysis appears to assume there was a legal method available to the government to obtain the Defendant's presence. "[T]he hallmark of government diligence is extradition." *United States v. Fernandes*, 618 F. Supp. 2d 62, 69 (D.D.C. 2009). Reliance on this method is a sensible course because there are objective factors -- definite dates and deadlines – to gauge the progress of the government to bring the Defendant to trial. The instant case is unlike the factual scenario presented, albeit not fully explored, in *United States v. Handa*, 892 F.3d 95 (1st Cir. 2018), where there was an extradition treaty between India and the United States which could have resulted in the extradition of the defendant. Here, there were no legal or diplomatic options. "[A]s a general matter, the United States has obligation to seek the extradition of an international fugitive **unless such efforts would be futile**." *United States v. Eguez,* WL 6493456 (M.D. Fla. Nov. 2. 2016)(emphasis added). The government suggests that where there

were no options other than waiting for the Defendant to travel on his US passport[1] and/or leave Lebanon.

Defendant makes a passing reference to the fact that there is no extradition treaty between Lebanon and the United States. He fails, however, to address fully his status and its role in this analysis.

**B. Defendant is a Lebanese citizen and is not subject to expulsion or deportation**

Defendant is considered a Lebanese citizen by the government of Lebanon. The Defendant was naturalized as a U.S. citizen in 2010 and may have registered with the U.S. Embassy in Beirut. Neither fact obviated his Lebanese citizenship that is determined from the paternity of the individual.[2] According to the Office of International Affairs (OIA), Department of Justice officials, based upon prior negotiations with Lebanon, the Defendant's U.S. citizenship would not be controlling in this matter and Lebanon would not honor any request to expel or deport the Defendant.

OIA have advised that Lebanon has considered, in the past, requests from the United States with respect to individuals wanted by law enforcement. In some cases, if the individual does not have citizenship status in Lebanon, the country has expelled or deported them. OIA

---

[1] Upon information and belief, the sources being conversations with agents of Homeland Security Investigations, law enforcement has no ability to track the travel of individuals using foreign passports.

[2] The Defendant's application for a U.S. passport indicates that his father was born in Lebanon. As noted, Defendant still retained his expired Lebanese passport. According Lebanon Embassy website, among the requirements to apply for the renunciation of the Lebanese citizenship one must return the original Lebanese Passport and Lebanese ID or extract of individual/family civil registration. See http://www.lebanonembassyus.org/renunciation-of-lebanese-citizenship.

officials are unaware of any time that Lebanon has considered expulsion or deportation for a person who has dual citizenship with Lebanon and the United States.

This fact is central to the analysis of government action. The government was aware there was no extradition treaty between Lebanon and the United States. See 18 U.S.C. § 3181 for a listing of all countries with extradition treaties with the United States. Moreover, the government was aware that, based upon past practices, Lebanon will refuse to extradite a Lebanese citizen and will not consider the fact of U.S. citizenship in its calculus. "[W]here our government has a good faith belief supported by substantial evidence that seeking extradition from a foreign country would be futile, due diligence does not require our government to do so." *United States v .Corona-Verbera*, 509 F.3d 1105, 1114 (9th Cir. 2007).

According to OIA officials, despite the fact that the Defendant may have appeared at the U.S. Embassy, he could not be ordered to return to the United States. No arrest could be executed on the Embassy grounds even though those grounds are considered territory of the United States.

The Defendant seems to suggest that some sort of notification to him, outside of the extradition or diplomatic effort process, was still required even under these circumstances. Defendant asserts "the government could … have easily contacted the defendant, arguing that the government should not have had "any concerns about 'tipping him off' and thus causing him to avoid apprehension" because the Indictment was unsealed and was a matter of public record. However, that would be true only if the Defendant knew about the indictment, which the Defendant denies. Given the manner and timing of his exit from the United States, there was no reason for law enforcement to assume that a general notification would cause the Defendant to leave his home and family and travel to the United States to be placed under arrest. Based upon

5

the facts and circumstances known to the government at the time, the Defendant may have had concerns about his alleged behavior relating to the charged conspiracy at the time he left. Those concerns, coupled with two large seizures during the investigation the month before the Defendant left the United States, might have been the reason he left the United States and waited more than five years – the time in which the statute of limitations would run -- to return to the United States.

Requiring the government to take steps to personally contact the Defendant, outside of a legal or diplomatic process, would devolve into situations not governed by a definitive process but upon a notification or contact. With the standard of extradition, at the very least, the court can easily determine if the government has taken appropriate steps. In the Defendant's scenario, the court has no objective criteria to gauge the government's conduct.

### III. Assertion of Right

Defendant's argument here tries to boost itself upon the length of time in arguing that the Defendant could not assert what he did not know. By the same token, the Defendant correctly claims that the Indictment was a matter of public record. Defendant appears to want to lay claim to both sides of this argument. Law enforcement would have no idea if Defendant knew or not. The Defendant could easily have known and chosen not to return. Prior to his actual return to the United States in June of this year, there was no way to know. Defendant relies upon his actions – which occurred well after five years from the date of the Defendant's conduct – to support the contention that his actions were that of an uninformed individual. In hindsight, those actions may have some value but those facts were unknown to law enforcement until the date of the Defendant's entry into the United States.

**IV. Prejudice – Actual or Otherwise**

Assuming for sake of this argument that Defendant was unaware of the pending charges, it is difficult to see how then how prejudice accrued to the Defendant. As noted, "in prior cases that unreasonable delay between the formal accusation and trial threatens to produce….. 'oppressive pretrial incarceration', anxiety and concern of the accused and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence." United States v. Doggett, 505 U.S. 647, 654 (1992). Without knowledge of the Indictment, there could not have been great anxiety of a pending indictment and, since Defendant was released on conditions shortly after his arrest here, there appears to be no issue regarding prolonged pretrial detention. Defendant makes no mention of memories or evidence. The Defendant circles back to "the length of time" argument to support the prejudice argument. Standing alone, this is insufficient. The First Circuit noted that the question of extent to which the passage of time has hampered the preparation and presentation of a defense "is more complicated than simply matching delay with prejudice." *United States v. Walsh*, 300 F.3d 27 (1st Cir. 2002). Without individualized analysis of if prejudice accrued or how specifically his defense is impaired -- particularly in light of the discrete and definitive conduct with which he is charged -- it is difficult to see a compelling argument.

**Crux of Defendant's Charged Conduct is specific and defined.**

At the Defendant's detention hearing held on June 7, 2018, Homeland Security Investigations (HSI) Acting Assistant Special –Agent-in-Charge Michael Krol testified to the following[3]:

---

[3] The information and references herein are taken from the hearing transcript as well as from HSI reports that have been provided during discovery to the Defendant.

In 2012, there was an HSI investigation into an organization based out of Canada that was moving narcotics and transferring bulk sums of currently around the United States. HSI agents, in undercover capacities, posed as potential money launderers. On or about April 10th and 11th of 2012, following the usual procedure that had been set up, an undercover agent (UCA) made contact by phone with an individual identified only as Jack. The UCA and Jack agreed to meet at the Arsenal Mall in Watertown, MA for a money delivery. On April 11th and 12th, the UCA made contact with an unknown male by phone. During the conversations, the individual, identified himself as "Jack's cousin" and said he would be ready to meet and "drop off his taxes." On April 12th, 2012, surveillance agents observed a silver Nissan Sentra (MA Reg. 939DD1), registered to the Defendant in his name, Issam Elnaddaf, living at 8 Bates Avenue, #1, Quincy, MA, drive into the Mall parking area. The male exited the vehicle and retrieved a box from the trunk. The male then walked over to the UCA's vehicle and had a brief conversation with the UCA. The male opened the rear door and put the box in the UCA's vehicle. When the box was later opened, it contained $112,060 in cash. Surveillance teams followed the Nissan Sentra back to Bates Avenue in Quincy. Later, the UCA identified the Defendant from a Massachusetts Registry of Motor Vehicles photograph as the individual who delivered the bulk currency to the UCA.

Although charged as a conspiracy, in essence, the known conduct of the Defendant takes place over, at most, a period of one to three days. There are phone calls but at its core, there is one singular – and the government would argue - memorable act that underlies the charges. On one known day, the Defendant, driving his own car registered to him at his then-address, went to a particular location identified as the Arsenal Mall in Watertown, MA. There, he took a box containing over $100,000 in cash and, after a brief interaction, delivered it to another individual

whom he had never met before.  Multiple surveillance teams observed Defendant arriving and leaving at the location and he was surveilled until he arrived back at his known address. This is not a document-intensive case.  Defendant does not claim there are unavailable witnesses or that the memory of important witnesses have faded with time.  Defendant has failed to set forth any way in which his purported defense has been impaired by the passage of time.  (See *United States v. Davis,* 690 F.3d 912 (8th Cir. 2012)(speedy trial challenge failed when Davis failed to show why purported failure of memory of prosecution witness would impair his defense).

## **CONCLUSION**

In sum, Defendant has failed to mount a sufficient challenge to his prosecution under the Speedy Trial Act and the government respectfully requests that the court deny his motion in its entirety.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney


        By: /s/ Nadine Pellegrini
        Nadine Pellegrini
        Assistant United States Attorney
        617/748-3261

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

/s/ Nadine Pellegrini  
Nadine Pellegrini  
Assistant United States Attorney

Date: September 13, 2018