UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )      CRIMINAL ACTION NO.
                               )      13-10289-2-DPW
v.                             )
                               )
ISSAM EL NADDAF                )
                               )
              Defendant.       )


MEMORANDUM AND ORDER
March 16, 2023

Issam El Naddaf was accused of knowingly delivering the
cash proceeds of drug sales to a fellow member of a money
laundering conspiracy in violation of 18 U.S.C. § 1956(h).
Facing a new trial — following an initial trial which ended when
the jury could not agree upon a verdict — he seeks (i) a
judgment of acquittal on grounds that the government failed to
present sufficient evidence to prove the charge against him or,
alternatively, (ii) dismissal of the charge against him as a
result of proceedings violative of his constitutional right to a
speedy trial.  I find both grounds meritorious and, will
accordingly, terminate this case in this Court.

## I. BACKGROUND

### A.    *The Investigative Initiative*

In April of 2010, Department of Homeland Security ("DHS")
agents began an investigation of a marijuana trafficking
operation originating in Montreal.  Federal agents learned that

a collection of individuals across Canada and the United States were working to traffic drugs and launder cash by selling marijuana from Montreal in the northeastern region of the United States, specifically Boston, then consolidating the proceeds of those sales in bulk and travelling with the cash to Los Angeles, California.  There, the cash would be handed off to others who would use it to purchase methamphetamine, cocaine, and other controlled substances.  Those drugs would then be sent back to Montreal to continue the cycle.  Federal agents were able to gain information regarding the operation from a cooperator.

As part of this investigative initiative, in April 2012 DHS Agent Michael Krol obtained a phone number and codename for a person who would soon set up a cash pickup in the Boston area.

DHS Special Agent Brendan Hickey, working undercover as a purported participant in the drug distribution operation, was tasked to call this person — codename "Jack" — and arrange to pick up approximately $115,000 in marijuana sale proceeds. Agent Hickey called the phone number and connected with an unknown individual who introduced himself as "Jack."  Agent Hickey spoke to the self-identified "Jack" by phone once on April 11, and again just before noon on April 12, to finalize plans for the meeting.

At 1:44 P.M. on April 12, Agent Hickey called Jack's phone number and an apparently different person, someone who identified himself as "Jack's friend," answered.  This individual informed Agent Hickey that "Jack can't make it" but that he — "Jack's friend" — would meet Agent Hickey.  "Jack's friend" then asked where they should meet.  Agent Hickey informed the individual that he would call back.  He called "Jack's" phone number again at 2:23 P.M. and again spoke to "Jack's friend."  Agent Hickey arranged to meet with "Jack's friend" in the parking lot of a mall in Watertown, Massachusetts that afternoon.

Around 3:30 P.M., Mr. El Naddaf came to meet Agent Hickey in the parking lot, spoke with him briefly, and transferred to him a box that was designated for packaging sink faucet materials and had been resealed with tape.  The two engaged in a brief conversation and then Mr. El Naddaf got back into his car and drove away to return directly to his verifiable place of employment.  The resealed box was not opened during the parking lot meeting and neither Mr. El Naddaf nor Agent Hickey spoke of its contents.  Inside the box investigators —  who later opened the box after Mr. El Naddaf left the scene — found $112,060 in cash.

Six days later, on April 18, Agent Hickey, still
undercover, arranged to deliver those funds to another
individual identified in the investigation — codename "Bobby" —
parked in a Target parking lot just outside Los Angeles.  During
the course of the ongoing investigation, "Bobby" was identified
as Joseph Cimino.  Mr. Cimino was later arrested and charged as
one of Mr. El Naddaf's co-defendants in this matter.

**B.    *The Charging Initiative and the Unsealing of the Charging Documents***

In the operative charging document — the Superseding
Indictment returned on December 10, 2014 — upon which his trial
was conducted, Mr. El Naddaf and each of his three co-defendants
were charged with a single count of conspiracy to launder
monetary instruments, in violation of 18 U.S.C. § 1956(h).  In
Mr. El Naddaf's case, the charge was based on his delivery of
the resealed package containing $112,060 in cash to undercover
DHS Agent Hickey on April 12, 2012.

Mr. El Naddaf had initially been charged along with three
co-defendants — Joseph Cimino, Christopher Staniforth, and
Husain Yassin — on September 26, 2013,[1] by sealed indictment,

---

[1] The original indictment, in addition to charging all four
defendants with conspiracy in Count One, charged Mr. El Naddaf
and Mr. Cimino in Count Two with substantive money laundering
and aiding and abetting in connection with the delivery by Mr.

with one count of conspiracy to launder monetary instruments and a substantive count of money laundering related to the April 12, 2012 delivery.  Sealed warrants for his arrest and the arrests of his co-defendants issued the same day.

For his part, Mr. Cimino was arrested on November 5, 2013 in Los Angeles.  The case was unsealed July 16, 2014 as to all co-defendants, on the government's motion because a second co-defendant, Mr. Yassin, had been arrested, and the remaining two co-defendants, Mr. El Naddaf and Mr. Staniforth, were "believed" by the government at that time "to be outside the United States."  The government then obtained the December 10, 2014 superseding indictment,[2] which was also unsealed, charging Mr. El

---

El Naddaf on April 12, 2012 and the corresponding receipt by Mr. Cimino in California, on April 18, 2012, of funds derived from the delivery.  Mr. Staniforth and Mr. Cimino were charged in Count Three with substantive money laundering and aiding and abetting in connection with a delivery of funds by Mr. Staniforth, also in April 2012 in Massachusetts and the corresponding receipt by Mr. Cimino in California on May 1, 2012 of funds derived from that delivery.  Mr. Cimino was also charged in Count Four substantively with money laundering and aiding and abetting in connection with a delivery of funds in Massachusetts on August 7, 2012 and the corresponding receipt by Mr. Cimino in California on August 9, 2012 of funds derived from that delivery.  Mr. Yassin was charged alone in Count Five with his delivery of funds in Massachusetts on November 28, 2012 and the corresponding receipt of funds derived from that delivery in California on December 4, 2012.

[2] Well before Mr. El Naddaf was arrested upon his return to the United States in 2018, Joseph Cimino pled guilty before me on April 30, 2015 to conspiracy to launder monetary instruments as

Naddaf with participating in a single count of conspiracy to launder monetary instruments, 18 U.S.C. § 1956(h).  Although the arrest warrant for the charges laid in the original indictment had been unsealed, however, the arrest warrants for Mr. El Naddaf and Mr. Staniforth — the defendants not previously arrested — in the superseding indictment has remained under seal in the absence, apparently as a result of inadvertence, of an unsealing motion by the government.

## C. *Mr. El Naddaf's Citizenship, His Absence from the United States and His Arrest*

Mr. El Naddaf is a United States citizen who was born in Lebanon.  He had moved to the United States in 2001 and became a naturalized citizen in 2010.  On January 17, 2013, eight months before the government undertook to charge him and his co-defendants in the original indictment in this matter, Mr. El Naddaf moved back to Lebanon to assist his elderly father in relocating from Saudi Arabia to Lebanon and to care for him. Mr. El Naddaf, without dispute by the government, states in an

---

evidenced by the transactions realleged as Overt Acts (b) (April 18, 2012), (d) (May 1, 2012), and (f)(August 9, 2012) in the superseding indictment.  Similarly, on June 18, 2015, co-defendant Husain Yassin pled guilty to the money laundering conspiracy as evidenced by the transaction realleged as Overt Act (i) (November 28, 2012) in the superseding indictment.  The fourth co-defendant charged in both the initial and the superseding indictments, Christopher Staniforth, appears to remain a fugitive to this day.

affidavit submitted in support of his motion to dismiss the indictment, that when he moved back to Lebanon, he lived with his elderly parents for several months before marrying a Lebanese woman in October of 2013. While in Lebanon, Mr. El Naddaf worked with his brothers in a family business importing and installing roof-sealant materials.

In 2013, Mr. El Naddaf registered with the United States Embassy in Beirut as an American citizen living in Lebanon. The government does not dispute that he visited the Embassy on at least two other occasions as well.[3] Each time he visited the Embassy, Mr. El Naddaf presented his United States passport to gain entry. Mr. El Naddaf represents, again without contradiction by the government, that he was never alerted to the existence of a warrant for his arrest on those occasions.

Mr. El Naddaf arranged on June 4, 2018 to return to the United States on a one-way ticket, with the intention of returning to live in this country permanently. He travelled to Logan Airport with his wife and three-year-old daughter. When they arrived, Mr. El Naddaf was immediately arrested. Mr. El

---

[3] In June 2013, he went to pick up a tourist visa for his wife and on May 23, 2018, before his planned move back to the United States, he returned to the Embassy to have documents processed that would allow him to sponsor his wife and daughter for permanent residency in the United States.

Naddaf was arraigned on June 5, 2018, and was released by Magistrate Judge Cabell from federal detention on an unsecured bond on June 12, 2018.

Mr. El Naddaf contends, and the government has presented no evidence to the contrary, that until his arrest on June 4, 2018, he was unaware of the existence of either the initial indictment, or the superseding indictment charging him in this matter.  It does not appear on this record that between September 26, 2013, and June 4, 2018, the government made any attempt to locate, or to contact Mr. El Naddaf in Lebanon concerning the charges pending against him in the United States.

Once arrested upon his return to the United States, Mr. El Naddaf promptly moved to dismiss the superseding indictment, asserting that the 56-month delay between his initial indictment and his arrest constituted a violation of his Sixth Amendment right to a speedy trial.[4]  The parties, in a series of memoranda filed thereafter, advanced their arguments regarding the application of the Sixth Amendment speedy trial clause to this

---

[4] The First Circuit has made clear that in a circumstance such as that presented by the operative indictment charging Mr. El Naddaf here, the speedy trial date is not reset to the date of the superseding indictment because the offense charged involves the same conduct as was initially charged and there was no additional charge lodged against him in the superseding indictment.  *United States* v. *Handa*, 892 F.3d 95, 106-07 (1st Cir. 2018).

matter.  I reserved decision on the motion and the case proceeded to trial.

**D.    *Trial***

Mr. El Naddaf's jury trial commenced on April 16, 2019.  In its case in chief, the government presented testimony from five witnesses, including Agent Hickey and Mr. El Naddaf's co-defendant, Joseph Cimino.

### 1.    Evidence Adduced at Trial Regarding Mr. El Naddaf's Participation in the Money Laundering Conspiracy

The government argued to the jury that circumstantial evidence presented at trial proved beyond a reasonable doubt that Mr. El Naddaf knew that he was assisting in an operation to launder funds obtained through criminal activity when he delivered the package to Agent Hickey on April 12, 2012.  The circumstantial evidence was gathered from a variety of sources.

### a.    *The Recorded Phone Calls and Related Undercover Activity*

The government introduced recordings made by Agent Hickey of four of his phone calls with "Jack" and "Jack's friend" on April 11 and 12, 2012 to arrange the April 12 meeting.  Agent Hickey's first call on April 11 led him to speak only with "Jack" but during their discussion, neither "Jack" nor Agent Hickey mentioned the purpose of their upcoming meeting.  On the morning of April 12, 2012, Agent Hickey called "Jack" again.

This time, they discussed the logistics and possible locations of their meeting later that day.

That same day, Agent Hickey then missed several calls from the phone number associated with "Jack."  At 1:44 P.M., he called "Jack's" number again.  An unknown person, who identified himself as "Jack's friend," answered and informed Agent Hickey that "Jack can't make it."  At trial, Agent Hickey identified Mr. El Naddaf as "Jack's friend," the man with whom Agent Hickey met later on April 12, 2012.

During their first April 12 call, "Jack's friend" asked Agent Hickey where they should meet, informing the agent that he was a cab driver and that he knew the city well.  "Jack's friend" told Agent Hickey that he wanted to get the meeting done because he "need[ed] to do [his] taxes for this year."  Agent Hickey told "Jack's friend" he would call back shortly and called again at 2:23 P.M.  When Agent Hickey again asked what happened to "Jack," "Jack's friend" replied: "he's busy that's . . . why I'm only doing what I was told brother."  Agent Hickey then directed "Jack's friend" to meet him at the Arsenal Mall in Watertown, Massachusetts between 3:15 and 3:30 P.M. "Jack's friend" briefly discussed the traffic on Route 93 North, and the HOV lane, but neither he nor Agent Hickey discussed the purpose of the meeting.

10

With respect to the phone conversations between "Jack's friend" and Agent Hickey, the government argued that Mr. El Naddaf's use of the phone number associated with the individual known as "Jack" and in turn with the drug trafficking operation, together with his mention of the codename "Jack," demonstrate that Mr. El Naddaf was a participant in the greater drug trafficking and money laundering operation that DHS was investigating.  The government, in briefing, further characterized Mr. El Naddaf's statement that he needed to do his taxes as an oblique reference to the cash exchange planned for the meeting.  The government suggests that a jury could infer from those calls that Mr. El Naddaf knew he was agreeing to deliver illegal cash proceeds to Agent Hickey.

     *b.   The Circumstances of Mr. El Naddaf's Delivery*

At trial, Agent Hickey provided a narrative account regarding the April 12 delivery of the resealed box.  He testified that he arrived first at the meeting point around 3:00 P.M. with a full team of agents put in place to conduct surreptitious surveillance and ensure his safety.  He parked near the entrance to a Dunkin' Donuts and waited in his car for "Jack's friend" to arrive.  At some point, he received a call from "Jack's friend," who described the car he was driving and reported that he would be at the meeting location shortly.

Minutes later, agents surveilling the area observed the
person later identified as Mr. El Naddaf leaving the nearby
Dunkin' Donuts with a coffee.  Mr. El Naddaf approached Agent
Hickey and engaged him in a brief conversation about where the
parties would park their cars.  That conversation was not
recorded.  Changing parking locations, Mr. El Naddaf pulled his
car next to Agent Hickey's, retrieved a previously used and
resealed box from his trunk, walked over to the Agent's car, and
placed the box on the driver's side back seat of Agent Hickey's
car.  The box was bound with packing tape and, according to
Agent Hickey's testimony, remained "very secure[ly]" sealed
throughout the meeting.  There was no discussion of the contents
of the box or the purpose of the meeting generally.

After delivering the box to Agent Hickey, Mr. El Naddaf
returned to his vehicle and left the area.  Agent Hickey came
abreast of Mr. El Naddaf for a moment when they were waiting at
the same stoplight while departing the Arsenal Mall.  Agent
Hickey testified that Mr. El Naddaf acknowledged him with a
smile and "a quick wink as he pulled away."

Federal agents surveilling the scene followed Mr. El
Naddaf.  Mr. El Naddaf was driving his own car, registered in
his own name, and went from the meeting straight to his

workplace at C&L Auto, apparently without any evasive driving maneuvers or making any detours.

When investigators later opened the resealed box, they found two vacuum-sealed plastic bundles of cash, amounting to a total of $112,060.  Investigators discarded the box itself and the plastic wrappings encasing the cash; consequently, that evidentiary material could not be examined for fingerprints. The agents did not obtain phone records associated with "Jack's" phone number.

There was no evidence that "Jack" himself was ever identified by federal agents in the course of their investigation.  The government presented no evidence that either the government cooperator, or the other individuals charged as part of the conspiracy, ever made mention regarding any knowledge of or connection to Mr. El Naddaf.  Co-defendant Joseph Cimino, in fact, testified at trial that he had never met, spoken to, or even heard of Issam El Naddaf during his own involvement in the April 2012 money laundering operation.

### 2.   Motion for Judgment of Acquittal Before Submission of Case to Jury

Mr. El Naddaf moved for a directed verdict pursuant to FED. R. CRIM. P 29(a) following the government's case in chief, asserting that the government's evidence was insufficient to

support a conviction of conspiracy to commit money laundering.
I reserved ruling on the motion until after the jury returned
its verdict.  The defense then rested without offering further
evidence.

### 3.  Jury's Inability to Reach a Verdict

The government and the defendant presented closing
arguments on April 22, 2019, after a long weekend.  I instructed
the jurors and they began deliberations that morning at 10:35
A.M.  At 12:01 P.M. the same day, I received the first of
several questions and communications from the jury asking what
the government was required to prove to obtain a conviction.[5]
After conferring with counsel, I responded in writing.  At 2:10
P.M. I received a second jury question, again seeking
clarification of what the government was obligated to prove.[6]
After conferring with counsel, I submitted a preliminary

---

[5] The jury's initial note stated: "Does the government need to
prove, beyond [a] reasonable doubt, that the defend[a]nt knew
the box was money [and] knew it was money from distributing
illegal drugs? Did he also need to know that the transaction
involved interstate [and] foreign commerce?"

[6] The jury's second note read:

> What specifically are the essential elements of the
> offense that must be proven, beyond a reasonable doubt?
> Essential elements: The purpose of the conspiracy was to
> engage in financial transaction(s) in interstate or
> foreign commerce.  The defend[a]nt knew the contents of
> the box involved proceeds of some form of illegal
> activity constituting some felony.  What else?  Jury
> Exhibit # 2 Clarify proceeds[.]

response to the jury in writing and asked the parties to file
proposed further responses.  The jury was then sent home for the
day.

On April 23, 2019, I held a conference with counsel
regarding further response to the jury's second question and
then drafted and delivered that further response to the jury in
writing.  At 11:35 A.M. and 11:45 A.M., I received two more
communications from the jury, which respectively stated they
were at the "point where we all wont [sic] agree to one verdict"
and, again, asked for further clarification on what government
was required to prove.  After conferring with counsel, I
submitted yet another written response to the jury at 12:10 P.M.
Ten minutes later, at 12:20 P.M., I received a further jury
communication stating "[w]e are still at a point where we wont
[sic] all agree to one verdict."  After consulting with counsel,
I brought the jury into the courtroom, and delivered a modified
*Allen* charge,[7] and sent the jurors back to deliberate.  At 3:23
P.M., I received another communication from the jury indicating
they were still unable to reach a unanimous verdict.

I infer that at this point, the jurors found themselves
struggling without apparent prospect of success to reach

---

[7] *See Allen* v. *United States*, 164 U.S. 492 (1896) *as modified by
United States* v. *Nichols*, 820 F.2d 508, 511-12 (1st Cir. 1987).

consensus regarding the scienter necessary for the government to meet its burden of proof.  After conferring with the parties, neither of which objected to my indication that the point of mistrial had been reached, I had the jury brought into open court, dismissed the panel, and declared a mistrial.

> ### 4. Post-Trial Motion for Acquittal and Further Motion to Dismiss Practice Regarding Constitutional Speedy Trial Violation

After the jury was discharged, Mr. El Naddaf renewed his motion for acquittal under FED. R. CRIM. P. 29(c).

The parties made supplemental post-trial submissions regarding both the pending motion to dismiss the superseding indictment for violations of Mr. El Naddaf's Sixth Amendment right to a speedy trial and the renewed acquittal motion.  The motions were taken up at a further hearing following the supplemental submissions.

## II. MOTIONS FOR ACQUITTAL

Under Rule 29 of the Federal Rules of Criminal Procedure, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a).  Rule 29(b) permits the court to reserve decision on a motion for a judgment of acquittal, submit the case to the jury, and decide the motion after the jury returns a verdict, or, as here, after the jury is discharged without

16

having rendered a verdict.  FED. R. CRIM. P. 29(b).  Even when
"the jury has failed to return a verdict, the court may enter a
judgment of acquittal."  FED. R. CRIM. P. 29(c)(2).

## A.   *Sufficiency of the Evidence Standard*

A motion for judgment of acquittal will be granted when
"the evidence and all reasonable inferences to be drawn from the
evidence, both taken in the light most favorable to the
government, are insufficient for a rational factfinder to
conclude that the prosecution has proven, beyond a reasonable
doubt, each of the elements of the offense."  *United States* v.
*Pimental*, 380 F.3d 575, 584 (1st Cir. 2004).  "The relevant
inquiry is not whether a reasonable jury could have acquitted
the defendant, but rather whether a reasonable jury could have
found that the government proved each element of the crime
beyond a reasonable doubt."  *United States* v. *Stewart-
Carrasquillo*, 997 F.3d 408, 418 (1st Cir. 2021) (internal
quotations omitted) (quoting *United States* v. *Paz-Alvarez*, 799
F.3d 12, 25 (1st Cir. 2015)).

When a "defendant challenges the sufficiency of the
evidence, all of the proof must be perused from the government's
perspective."  *United States* v. *Correia*, 55 F.4th 12, 26 (1st
Cir. 2022) (internal quotations omitted) (quoting *United States*
v. *Kilmartin*, 944 F.3d 315, 325 (1st Cir. 2019)).  I must draw

17

all reasonable inferences in the light most favorable to the
prosecution, and then consider whether a rational jury could
find that the body of direct and circumstantial evidence
constituted proof beyond a reasonable doubt of the defendant's
guilt.  *See United States* v. *Burgos*, 703 F.3d 1, 9 (1st Cir.
2012).

### 1.   Limitations Regarding Government Reliance on Circumstantial Evidence to Support a Conviction

While the applicable standard certainly carries what the
First Circuit has characterized as "prosecution-friendly
overtones," *United States* v. *Ortiz*, 966 F.2d 707, 711-12 (1st
Cir. 1992), the First Circuit has long taken the position and
repeatedly emphasized that judicial "oversight of sufficiency
challenges is not an empty ritual," *id.* at 711-12.  This is
because the reasonable-doubt standard "is a prime instrument for
reducing the risk of convictions resting on factual error."  *In
re Winship*, 397 U.S. 358, 363 (1970).

Under First Circuit case law, I can discern three
principles that cabin the deference afforded to government proof
by circumstantial evidence when subjected to a sufficiency
challenge.

First, the government's evidence will not support a
conviction when, even viewed as a whole and in the light most

18

favorable to the government, it "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged." *United States* v. *Flores-Rivera*, 56 F.3d 319, 323 (1st Cir. 1995) (internal quotations and citation omitted); *see United States* v. *Guzman-Ortiz*, 365 F. Supp. 3d 215, 218-19 (D. Mass. 2019), *aff'd*, 975 F.3d 43 (1st Cir. 2020). If the only evidence of a defendant's guilt can be described, at best, as equal to or equally supportive of an alternative theory of the defendant's innocence, or nearly so, then "a reasonable jury *must necessarily entertain* a reasonable doubt." *Flores-Rivera*, 56 F.3d at 323 (internal quotations and citation omitted).

Second, it is well-established that when weighing the possible theories supported by the government's evidence, the court "must 'reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" *United States* v. *Rodríguez-Martinez*, 778 F.3d 367, 371 (1st Cir. 2015) (quoting *United States* v. *Spinney*, 65 F.3d 231, 234 (1st Cir. 1995)). A conclusion of guilt depending upon circumstantial inferences, for example, must reasonably be based in the evidence presented at trial, such that "(1) the inferences derive support from a plausible rendition of the record, and (2) the conclusion[] flow[s] rationally from those

19

inferences." *United States* v. *López-Díaz*, 794 F.3d 106, 111
(1st Cir. 2015) (quoting *Spinney*, 65 F.3d at 234).  Put another
way, the reviewing court should not strain to draw inferences
that have not been established sufficiently for a jury to find
the defendant guilty of each element beyond a reasonable doubt.
*See United States* v. *Valerio*, 48 F.3d 58, 64 (1st Cir. 1995)
("[A]lthough the government need not exclude every reasonable
hypothesis of innocence in order to sustain the conviction, we
are loath to stack inference upon inference in order to uphold
the jury's verdict." (citations omitted)); *see also United
States* v. *Guzman-Ortiz*, 975 F.3d 43, 55 (1st Cir. 2020)
(rejecting the government's invitation "to engage in . . .
impermissible inference stacking" to conclude that the defendant
was a member of a conspiracy); *Burgos*, 703 F.3d at 15 (holding
that "piling of . . . unfounded and unsupported inferences on
top of each other by the government is clearly contrary to our
own case law and that of the Supreme Court" (internal quotations
omitted) (quoting *United States* v. *DeLutis*, 722 F.2d 902, 907
(1st Cir. 1983)).

    Third, when the government's evidence — including all
reasonable inferences drawn in the light most favorable to the
prosecution — "does not support the inference that a defendant
had knowledge of the crime, [the First Circuit] ha[s]

consistently found the evidence insufficient." *Rodríguez-Martinez*, 778 F.3d at 371 (citing *United States* v. *Pérez-Meléndez*, 599 F.3d 31, 42 (1st Cir. 2010)); *see also Guzman-Ortiz*, 975 F.3d at 56 (finding "there is not sufficient evidence to permit a rational jury to find, beyond a reasonable doubt, that [defendant] intended to join and effectuate the drug distribution conspiracy"); *United States* v. *Santos-Soto*, 799 F.3d 49, 57 (1st Cir. 2015).

### 2.   Competing Approaches in First Circuit Sufficiency Analysis

I recognize that First Circuit case law can be read to contain competing tendencies that add another layer of complexity to sufficiency analysis in cases in which the circumstantial evidence offered to support a conviction could be explained alternatively by the defendant's innocent or culpable intent.  The polarities in these competing tendencies express themselves in different approaches to such fundamental questions as: whether the existence of an unrebutted, plausibly innocent explanation for the government's evidence requires acquittal; whether the defendant in order to mount a successful sufficiency challenge must affirmatively present an explanation for the government's circumstantial evidence that is more compelling than the government's theory of guilt; and whether a theory of

guilt can be strengthened to a point beyond reasonable doubt by eliminating innocent explanations for the evidence as implausible or not at all likely.  These questions are evident in two First Circuit cases illustrating the two competing approaches: *Stewart* v. *Coalter*, 48 F.3d 610 (1st. Cir. 1995) ("*Stewart IV*") and *United States* v. *Pothier*, 919 F.3d 143 (1st Cir. 2019).

        *a.   Stewart*

At the foundation of the *Stewart* litigation, which was ultimately resolved in federal court through a habeas corpus proceeding pursuant to 28 U.S.C. § 2254, was the defendant's conviction in Massachusetts Superior Court of second-degree murder on a joint-venture theory.  *Stewart IV*, 48 F.3d at 611-13.  His conviction was vacated on sufficiency grounds in his direct appeal to the Massachusetts Appeals Court.  *Id.* at 612 (citing *Commonwealth* v. *Stewart*, 571 N.E.2d 43 (Mass. App. Ct. 1991) ("*Stewart I*")).  His conviction was then reinstated by the Supreme Judicial Court following further appellate review.  *Id.* (citing *Commonwealth* v. *Stewart*, 582 N.E.2d 514, 518 n.3 (Mass. 1991) ("*Stewart II*")).  Mr. Stewart turned to pursuit of federal habeas relief on the basis that no rational trier of fact could have found him guilty beyond a reasonable doubt.  *Id.* at 612-13.  After reviewing the evidence, I found it insufficient to support

22

a conviction of second-degree murder on a joint venture theory
and granted the writ. *Stewart* v. *Coalter*, 855 F. Supp. 464, 466
(D. Mass. 1994) ("*Stewart III*").  A divided First Circuit panel,
however, disagreed in the culminating decision to the
litigation.  *Stewart IV*, 48 F.3d at 617.

In the *Stewart* litigation, as recounted by the First
Circuit in *Stewart IV*,[8] the government presented evidence of the
following:

- On the day of the murder, the defendant Mr. Stewart,
  the alleged shooter Mr. Good, and an unidentified
  third man were drinking together at a bar in
  Cambridge.  *Id.* at 611.

- Just before 8 A.M., Mr. Stewart was driving Mr. Good
  and the unidentified man around the neighborhood.  *Id.*
  When they drove past a cat sleeping on the hood of a
  car, Mr. Stewart made a U-turn, Mr. Good pointed his

---

[8] A more extended recitation of the evidence available for
consideration by the Federal habeas corpus court is provided in
the District Court opinion.  *Stewart* v. *Coalter*, 855 F. Supp.
464 (D. Mass. 1994)("*Stewart III*").  The evidence as reported in
the state court is found in the Massachusetts Appeals Court
decision, *Commonwealth* v. *Stewart*, 571 N.E.2d 43 (Mass. App. Ct.
1991) ("*Stewart I*") and the decision of the Supreme Judicial
Court, *Commonwealth* v. *Stewart*, 582 N.E.2d 514 (Mass. 1991)
("*Stewart II*").

handgun out of the passenger side window, fired twice, and killed the cat.  *Id.*

- Sometime before noon, Mr. Stewart parked his car on Maple Avenue.  *Id.* at 611-12.  Mr. Good lived a few blocks from Maple Avenue.  *Id.* at 615.  In none of the *Stewart* opinions that the First Circuit canvassed in *Stewart IV* could there be found any direct report for when Mr. Stewart parked his car on Maple Street, or when or how after Mr. Good may have left the car alone.

- At around noon, Mr. Good shot the victim, Mr. Perry, three times with a handgun, killing him.  *Id.* at 612.  Mr. Good, carrying the gun, ran down Maple Avenue back to Mr. Stewart's car and got inside.  *Id.*

- Mr. Stewart then drove down Maple Avenue, "accelerating to approximately 45 miles per hour" and, a few blocks later, "ran a stop sign and flashing red light and crashed into another car."  *Id.*

- Immediately following the crash, Mr. Good fled the scene.  When the police arrived, Mr. Stewart lied to the officers, offering the statement: "What's the big deal?  This is only an accident.  I'm the only one.  I'm the only one in the car."  *Id.*  On the floor of

the passenger seat, the police found a brown paper bag
that contained several live rounds of ammunition
similar to those used to kill Mr. Perry. *Id.*

The majority of the First Circuit panel in *Stewart IV* held
that the government had presented sufficient circumstantial
evidence to support the conclusion that Mr. Stewart knew that
Mr. Good was planning either to commit murder or to inflict
grievous bodily harm to his victim. *Id.* at 614-16. The court
evaluated various alternative explanations that could be drawn
from the same circumstantial evidence to determine whether a
reasonable doubt was presented as to Mr. Stewart's guilt. *Id.*
at 615-16. The majority found these alternative, innocent
explanations for Mr. Stewart's conduct "implausible" or not "at
all likely." *Id.* at 615. The prior shooting of the cat, what
the court termed the "strategic" parking of the car, the quick
departure and high-speed escape after the shooting by the
passenger, and the lies offered by the defendant to the police,
cumulatively satisfied the majority there was sufficient
evidence to establish that the defendant Mr. Stewart was engaged
in a joint enterprise with the passenger Mr. Good to commit
murder. *Id.* at 616.

In reaching this conclusion, the court observed that "a
conjecture consistent with the evidence becomes less and less a

25

conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely." *Id.* at 615-16.  The majority opinion explained that "[a] rational jury could, given the absence of other *likely* explanations, find the joint venture alternative so likely as to be beyond reasonable doubt." *Id.* at 616 (emphasis added).

> b.   *Pothier*

In its more recent decision in *Pothier*, however, the First Circuit appears to have provided a less latitudinarian approach — and one which does not look for affirmative proof by the defendant — in assessing the process of elimination of innocent explanations as an evidentiary approach to sufficiency analysis.

The jury in *Pothier* found the defendant guilty of "knowingly posess[ing] child pornography in violation of 18 U.S.C. § 2252(a)(4)(B)." 919 F.3d at 144 (alteration in original).  The evidence at trial established that child pornography was downloaded to an I.P. address registered to Mr. Pothier at an apartment located in Exeter, New Hampshire.  *Id.* But two other individuals received their mail at the residence as well. *Id.* at 144-45.

When executing a warrant to search for child pornography, police knocked on the door for about fifteen minutes and called and texted Mr. Pothier's cellphone.  *Id.* at 145.  Mr. Pothier

did not respond until authorities started to pry open the door.
*Id.*  Police focused their search on a laptop, that Mr. Pothier
admitted owning, in the living room.  *Id.*  Because the laptop
was not password-protected, police were able to access the
computer's contents on the scene and found, *inter alia*, a folder
with six videos of child pornography and an electronic file-
shredding program called "Evidence Eliminator."  *Id.*  A more in-
depth forensic search led to more evidence, including a video in
the laptop's recycling bin depicting child pornography and other
"remnants of child pornography," use of search terms in the
file-sharing application and on Google consistent with child
pornography, and personal documents associated with Mr. Pothier
and a third-party who was not shown to have had access to the
laptop.  *Id.*

The sole factual dispute before the jury was whether Mr.
Pothier knew his laptop contained the child pornography.  *Id.* at
147.  The First Circuit identified two possible scenarios
supported by the trial evidence: (1) that Mr. Pothier downloaded
the child pornography and "Evidence Eliminator," left his laptop
without password protection in a location where two other people
had access, and did not seek to conceal, destroy, or even lock
the laptop or run the file-shredding program during the fifteen
minutes when police were trying to gain access to the residence,

*id.;* or (2) that one of the other two individuals who received mail at the address used the laptop to download child pornography and, because they were not present when the police arrived, could not hide or destroy the computer or erase the child pornography, *id.*

The First Circuit concluded that "[e]ach scenario is plausible, and though one might debate their relative merits, to settle on one beyond [a] reasonable doubt would require guesswork." *Id.* Thus, while the First Circuit recognized that the record in *Pothier* "generate[d] hunches" consistent with guilt, it concluded that the record as developed presented "no tools for rationally confirming any one of the hunches beyond a reasonable doubt." *Id.* at 149. Finding no method of confirming that the government's theory of guilt was more consistent with the evidence than a theory of Mr. Pothier's innocence, the court held that the jury's verdict was not supported by sufficient evidence. *Id.* at 147-49.

####    c.   *Synthesizing the Competing Approaches*

The different analytical approaches and emphases to sufficiency analysis evidenced in *Stewart* and in *Pothier* create challenges in cases like the one now before me. *Stewart* can fairly be read to conclude that eliminating as unlikely or implausible all but one possible explanation for the defendant's

conduct, the one consistent with guilt, constitutes the functional equivalent of proving a defendant's guilt beyond a reasonable doubt.  By contrast, *Pothier* directs that, when the record supports more than one equally or nearly equally "plausible" scenario that cannot be ruled out on the basis of the evidence presented, *and* one of those scenarios is exculpatory, the court must recognize that no rational fact finder could find a defendant guilty *beyond reasonable doubt*.

The First Circuit's analysis in *Pothier*, some twenty-five years after its decision in *Stewart IV*, suggests that the court has refined its approach to sufficiency to ensure that the burden of proof never shifts to the defendant to present affirmative evidence of his innocence.[9]  Accordingly, I rely

---

[9] I observe that the First Circuit mentioned *Stewart IV* only once in its decision in *Pothier*.  And in that connection, *Pothier* cites only to language in *Stewart IV* *limiting* the reach of its analytical approach: that "[g]uilt beyond a reasonable doubt cannot be premised on pure conjecture."  *United States* v. *Pothier*, 919 F.3d 143, 147 (1st Cir. 2019) (alteration in original) (quoting *Stewart* v. *Coalter*, 48 F.3d 610, 615 (1st Cir. 1995) ("*Stewart IV*")).  I observe also that the First Circuit has echoed its approach in *Pothier* more recently in *United States* v. *Guerrero-Narváez*, 29 F.4th 1, 16 (1st Cir. 2022) ("At best, viewing the evidence in the light most favorable to the government gives equal or nearly equal circumstantial support to theories of guilt and innocence.  That is not good enough to meet the government's burden to prove its case beyond a reasonable doubt." (internal quotations and citations omitted)).  *See also United States* v. *Soler-Montalvo*, 44 F.4th 1, 10-11 (1st Cir. 2022).

principally on *Pothier's* analytical framework.  I evaluate the
proof to determine whether the circumstantial evidence raises
only "hunches" against whether that evidence is susceptible to a
reasonably plausible innocent interpretation that cannot be
eliminated.  *Id.; see Guzman-Ortiz*, 975 F.3d at 55.

In the context of that analytical framework, I turn now to
consider the specific elements that the government was required
to prove to convict Mr. El Naddaf of conspiring to commit money
laundering.

## B.    *The Government's Burden*

To prove that Mr. El Naddaf was a member of a conspiracy to
commit money laundering, 18 U.S.C. § 1956(h), the government was
required to prove beyond a reasonable doubt that Mr. El Naddaf
"agreed with one or more co-conspirators to 1) knowingly conduct
a financial transaction 2) involving funds that [he] knew to be
the proceeds of some form of unlawful activity and 3) that were
in fact the proceeds of a 'specified unlawful activity,' and 4)
that [he] knew the transactions to be designed in whole or in
part to conceal or disguise the nature, location, source,
ownership, or control of the proceeds of such unlawful

---

Notably, the First Circuit does not appear to have cited or
otherwise relied upon its 1995 decision in *Stewart IV* following
its 2019 opinion in *Pothier*.

activity." *United States* v. *Misla-Aldarondo*, 478 F.3d 52, 68
(1st Cir. 2007) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)).[10]

As the basis for his motion for judgment of acquittal, Mr.
El Naddaf specifically contends that the government failed to
establish beyond a reasonable doubt: (1) that he knew he was
engaging in a "financial transaction" on or about April 12,
2012; (2) that he knew that contents of the box he delivered on
April 12, 2012 were the proceeds of some form of unlawful
activity; and (3) that he knew that the April 12, 2012 financial
transaction was designed to conceal the proceeds of unlawful
activity, namely illegal drug distribution.  In sum, Mr. El
Naddaf's sufficiency challenge centers on the government's
failure to prove the knowledge required for a conviction of
money laundering conspiracy.

Given the specific focus of Mr. El Naddaf's challenge, a
fuller discussion of the government's burden of proof with

---

[10] Alternatively, the government might meet its burden as to the
fourth factor concerning knowledge of the design intent of the
transaction with proof Mr. El Naddaf "inten[ded] to promote
th[e] unlawful activity."  *United States* v. *Cedeño-Pérez*, 579
F.3d 54, 58 (1st Cir. 2009) (internal quotations and citation
omitted).  The government, appropriately in the circumstances of
the proof in this case, trained its opposition to Mr. El
Naddaf's motion for judgment of acquittal on his purported acts
of concealing the proceeds of unlawful activity, rather than
promoting unlawful activity.  I take the same approach in this
Memorandum.

respect to Mr. El Naddaf's knowledge on April 12, 2012 is called for.

The government was required to establish that Mr. El Naddaf "possessed the mental state required for the substantive offense" of money laundering. *Cedeño-Pérez*, 579 F.3d at 58 n.4. The government was required to present evidence from which a reasonable jury could determine that Mr. El Naddaf knew that he was participating in a financial transaction involving "proceeds of some unlawful activity" and "that he knew the transaction itself was 'designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of such unlawful activity,'" in other words, he must have "kn[own] that the transaction[] in which he participated w[as] part of a money laundering scheme." *United States* v. *Frigerio-Migiano*, 254 F.3d 30, 33-34 (1st Cir. 2001) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)); *see Misla-Aldarondo*, 478 F.3d at 68.

The government cannot meet this burden simply by suggesting the inference that Mr. El Naddaf suspected or even knew that his conduct was likely somehow unlawful. "Showing that the defendant had knowledge of generalized illegality is insufficient" to support a conviction under 18 U.S.C. § 1956(h). *Burgos*, 703 F.3d at 10 (describing conspiracy knowledge requirement in drug conspiracy matter). Thus, although the

32

government need not show that Mr. El Naddaf was "familiar with all the details of the conspiracy or with the identities of all other conspirators," *United States* v. *Ayala-Vazquez*, 751 F.3d 1, 15 (1st Cir. 2014) (citation omitted)), it must at least rely upon some evidence from which a jury could reasonably infer that Mr. El Naddaf "voluntarily participated to promote a criminal objective," here money laundering, *id.* (citation omitted).

Particularly in this case, where the proof suggests that Mr. El Naddaf was at most a courier — as distinguished from the source of the illegal proceeds involved in the financial transaction at issue — it is important to keep in mind that "the statute is concerned with his *knowledge of the source's intent* in the transaction." *United States* v. *Martínez-Medina*, 279 F.3d 105, 115 (1st Cir. 2002) (emphasis added) (citation omitted). Evidence that a scheme to launder proceeds from illegal activity existed and that Mr. El Naddaf was somehow connected to it, without more, will not satisfy the scienter required for money laundering conspiracy. *See Ayala-Vazquez*, 751 F.3d at 15 (explaining that "the government was required to introduce evidence showing that [the defendant] had entered into an agreement with one or more co-conspirators to commit . . . money laundering"); *cf. United States* v. *Austin*, 786 F.2d 986, 988 (10th Cir. 1986) ("[T]he government cannot prove a [drug]

33

conspiracy by presenting evidence that only places the defendant in a climate of activity that reeks of something foul." (internal quotations and citation omitted)).

Alternatively, if a defendant claims that he "lack[s] knowledge of the money laundering conspiracy,"[11] the government may prove that he was "willfully blind" to alleged "illegal activities around him." *Frigerio-Migiano*, 254 F.3d at 35. The First Circuit has recognized that "where there are prominent red flags that signal criminal activity is afoot, a jury may infer that a defendant deliberately ignored facts which would have otherwise been obvious to a reasonable person." *Id.* (internal quotations and citation omitted). Under those circumstances, "it would suffice for the jury to conclude that [the defendant] consciously averted his eyes from the obvious explanation for the funds." *United States* v. *Rivera-Rodríguez*, 318 F.3d 268, 272 (1st Cir. 2003). As will appear *infra* Section II.C., for purposes of my analysis, the sufficiency *vel non* of `evidence of Mr. El Naddaf's scienter is essentially the same under either the knowledge or willful blindness approach.

---

[11] During opening statements, counsel for Mr. El Naddaf contended that the jury would "not hear any evidence that Mr. El Naddaf ever knew of any such [money laundering] conspiracy, and there will not be any member of that supposed conspiracy who comes in here and tells you that Mr. El Naddaf was part of such a conspiracy."

C.   **The Evidence Presented to the Jury Was Insufficient to Support a Conviction of Money Laundering Conspiracy**

The government contends that a jury could reasonably conclude on the trial evidence that when Mr. El Naddaf delivered the resealed box on April 12, 2012, he (1) knew that he was engaged in a financial transaction, (2) knew he was delivering the proceeds of criminal activity, and (3) knew the financial transaction's purpose was to conceal the proceeds of the unlawful activity.  In the alternative, the government contends that the evidence supports the conclusion that Mr. El Naddaf was willfully blind to the money laundering conspiracy.  I disagree.

I conclude that while a jury could reasonably find that Mr. El Naddaf knew that the circumstances of the April 12, 2012 transaction were suspicious, the evidence presented at trial was insufficient to establish beyond a reasonable doubt that Mr. El Naddaf was aware of the contents of the resealed box, such that he could be said to have engaged knowingly in a financial transaction.  The government's evidence also failed to establish that Mr. El Naddaf made the delivery on April 12 knowing he was involved in a scheme that aimed to conceal the proceeds of illegal activity.  Finally, the government failed to demonstrate that there were sufficient "red flags" such that the jury could infer that Mr. El Naddaf was deliberately ignoring evidence of

criminal activity and as a result was willfully blind to the money laundering conspiracy.

### 1.   Knowing Engagement in a Financial Transaction

To demonstrate that Mr. El Naddaf knowingly engaged in a financial transaction, the government points to evidence that shows that Mr. El Naddaf (1) had conversations with Agent Hickey using the phone number associated with "Jack" and the conspiracy; (2) derivatively mentioned the code word to Agent Hickey by stating he was "Jack's friend"; (3) obliquely mentioned having to "do [his] taxes"; and (4) delivered the box containing the cash to Agent Hickey in a brief exchange.

Guided by the First Circuit's approach in *Pothier*, I "begin by spelling out the scenario the government's theory necessarily posits" in order to "assess[] the extent to which the evidence supports this argument."  919 F.3d at 147.

According to the government's theory, Mr. El Naddaf, as part of a conspiracy, agreed to deliver a box he knew contained over $100,000 in cash to an unknown conspirator, Agent Hickey, on behalf of a fellow conspirator, codenamed "Jack."  Mr. El Naddaf undertook to communicate to Agent Hickey that he was a member of the money laundering conspiracy by identifying himself as "Jack's friend."  Mr. El Naddaf then coyly signaled his understanding the two were about to engage in a financial

36

exchange by mentioning to Agent Hickey, just days before the federal tax deadline, that he needed to finish up any business and get home to do his taxes, a type of financial transaction.

But these strained inferences must overcome competing inferences presented by exculpatory circumstances undermining the specific scienter required. It is hardly probable that Mr. El Naddaf, if he knew he was about to make an illicit delivery of over $100,000 dollars of cash proceeds of criminal activity, would drive his own car, registered in his own name, to a public meeting point established by an unnamed stranger, Agent Hickey in his undercover capacity. Mr. El Naddaf, moreover, would under these circumstances be unlikely to leave a box, if he knew it contained $112,060 in cash, unattended in that car while he picked up a cup of coffee from Dunkin' Donuts immediately before the meeting. Additionally, it is improbable that Mr. El Naddaf, if he were engaged in a money laundering scheme, would have an unnecessary conversation with Agent Hickey, a stranger, in which he shared certain extraneous but truthful identifying details about himself, including his occupation as a cab driver. Remarkably, after delivering the sealed package to Agent Hickey, Mr. El Naddaf then openly drove straight to his place of work at C&L Auto without attempting evasive maneuvers designed to prevent him from being surveilled.

37

The government rests its case on a theory of guilt that, even if plausible, is hardly the most compelling explanation for the circumstantial evidence presented at trial.  True, Mr. El Naddaf could knowingly have invoked the codename "Jack" to provide verification of his bona fides as someone to effectuate the "financial transaction" because he had knowledge as to the box's contents.  But it is at least equally plausible, and perhaps even more so, that Mr. El Naddaf was simply provided with the codename from "Jack" (e.g., the person who Agent Hickey talked to on the first two calls on April 11 and 12, 2012).

Overall, an at least equally plausible explanation is that Mr. El Naddaf was simply an unknowing courier, who, unaware of the resealed box's contents, followed a third party's directive to state that he was "Jack's friend" and to deliver a resealed box as instructed.  In fact, with respect to the delivery, Mr. El Naddaf expressed on the phone that " I'm only doing what I was told brother."  Such an innocent explanation for Mr. El Naddaf's conduct is both plausible and at least as supported by the evidence as the government's theory of guilt.

That Mr. El Naddaf did not present his own evidence affirmatively to fill in the evidentiary gap in the government's case is of no moment.  Of course, he had no obligation to do so. *Pothier*, 919 F.3d at 148.  The government bears the burden of

proving its theory of the conspiracy specifically as it relates to Mr. El Naddaf, just as it does with each and every defendant it charges. *See id.* (citing *Jackson* v. *Virginia*, 443 U.S. 307, 316 (1979) ("[N]o person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.")).

Here, the circumstantial evidence of Mr. El Naddaf's knowledge that his delivery involved a financial transaction, let alone one in service of a money laundering scheme, is so thin that to choose between the scenarios would at best be to choose one "hunch[]" over another in an act of impermissible "guesswork." *Pothier*, 919 F.3d at 147, 149.  I cannot conclude that the government adduced proof in this case that would lead any rational jury member to find beyond reasonable doubt that Mr. El Naddaf knew he was engaged in a "financial transaction" when he delivered the sealed box to Agent Hickey on April 12, 2012.

### 2.   Knowledge that the Transaction Was Designed to Conceal Proceeds of Illegal Activity

Even if the government had presented sufficient evidence that Mr. El Naddaf knew he was delivering cash to Agent Hickey

as part of a financial transaction, I would still grant Mr. El
Naddaf's motion, because I find that the government failed to
meet its burden as to the knowledge required for money
laundering conspiracy under § 1956(h).  My review of the
government's evidence presented at trial leads me to conclude a
jury could not find beyond a reasonable doubt that Mr. El Naddaf
knew of the criminal origins of the money, and the concealment
purpose to its delivery, as a means of covertly moving money
between members of a money laundering conspiracy.  *See generally
Frigerio-Migiano*, 254 F.3d at 34 (explaining that, "[t]hough
onerous, the double-intent requirement" of proving knowledge of
participation in a "money laundering scheme" and that the money
in the financial transaction was "derived from an illicit
activity" "serves an important function by shielding innocent
individuals who engage in otherwise legal financial activity").

    3.   Willful Blindness of Money Laundering Conspiracy

As an alternative means of establishing Mr. El Naddaf's
scienter, the government contends that the evidence proved
beyond a reasonable doubt that Mr. El Naddaf was willfully blind
to the money laundering conspiracy.  The government points to
the fact that (1) the box containing the funds was heavier than
a faucet, the box's apparent content based on the outside box
packaging; (2) Mr. El Naddaf delivered the box of funds to an

unfamiliar man, Agent Hickey, in a parking lot; (3) Mr. El
Naddaf did not provide his actual name to Agent Hickey and did
not request identification from Agent Hickey; and (4) Mr. El
Naddaf told Agent Hickey that he was doing what he had been
told.  This was not sufficient.

Proof of willful blindness to a money laundering conspiracy
is sufficient if the jury can "conclude that [the defendant]
consciously averted his eyes from the obvious explanation for
the funds." *Rivera-Rodríguez*, 318 F.3d at 272.  As a general
proposition, in cases where the First Circuit has determined
there were sufficient "red flags" to support a finding of
willful blindness, there appears to have been some repetition in
the defendant's actions.  *See United States* v. *Adorno-Molina*,
774 F.3d 116, 125 (1st Cir. 2014) (explaining that "frequent
cash transfers," among other actions, contributed to
circumstantial evidence sufficient to find that defendant knew
the funds were laundered or that defendant ignored "warning
signs" of money laundering conspiracy (citations omitted));
*Rivera-Rodríguez*, 318 F.3d at 272 (finding that "more than one
. . . venture" involving "very large cash transactions" with
"concealment" and "false ownership" demonstrated red flags
showing a "pattern [that] was surely that of an effort to
launder illegally obtained proceeds").

41

Other circuits have taken a similar approach.  *See United States* v. *Flores*, 454 F.3d 149, 156 (3d Cir. 2006) (concluding that defendant, an attorney, knowingly engaged in or willfully blinded himself to money laundering activity where, *inter alia*, he "opened multiple bank accounts" on behalf of co-conspirator, saw large amounts of funds enter and exit the accounts, and was notified by one bank that the account activity "mirror[ed] the activity of . . . money launderers"); *United States* v. *Hatcher*, 132 F. App'x 468, 475-76 (4th Cir. 2005) (defendant at minimum "deliberately ignored" money laundering activity where defendant had previously helped drug dealer hide his "drug money," during pendency of scheme, "paid expenses that were grossly disproportionate to her income," and witnessed drug dealer pay for a car with a "wad of cash" (citation omitted)).

The government attempts to distinguish Mr. El Naddaf's conduct from that of the ultimately acquitted defendant in *United States* v. *Frigerio-Migiano*, 254 F.3d 30 (1st Cir. 2001). There, the defendant worked at a purported money remittance business that, in addition to some legitimate activities, "channeled over $26 million of drug money out of Puerto Rico." *Frigerio-Migiano*, 254 F.3d at 31.  The government presented evidence demonstrating that the legitimate activities were conducted in the front of the business, while the money

laundering occurred in the back. *Id.* at 32.  The defendant was hired to assist with small jobs around the office, *id.* at 31, but during his approximately seven weeks of work "witnessed large amounts of small-denomination cash, ranging from $10,000 to $300,000, brought in[to the business in] bags and boxes by 'flashy' and 'suspicious' individuals," counted funds in the back of the business, helped deposit funds, engaged in issuing false receipts, and was present at the business during a scan for surveillance devices, *id.* at 32-35.  In any event, the First Circuit still determined that this evidence was insufficient to warrant red flags of a money laundering scheme, noting that certain activities, such as scans for surveillance and counting money, occurred within legitimate businesses dealing with money. *Id.* at 34-36.

The government contends that "[d]elivering a cardboard box full of cash to a stranger in a parking lot is quite different" from the conduct in *Frigerio-Migiano* and should warrant red flags, apparently due to the concealment of the funds in Mr. El Naddaf's alleged transaction.  The government's argument ignores that nothing in the record before me indicates that Mr. El Naddaf was aware that the resealed box contained cash, such that he should have "ask[ed] the natural follow-up question to

determine the source of those funds." *United States* v. *Wert-Ruiz*, 228 F.3d 250, 257 (3d Cir. 2000).

Willful blindness does not "impl[y] that a defendant may be convicted simply because he or she should have known of facts of which he or she was unaware" and does not "equate[]" to "negligence or a lack of due care." *Id.* at 255.  At most, the evidence submitted by the government demonstrates that Mr. El Naddaf, perhaps negligently, ignored signs of some sketchy activity.  That is not enough for the government to meet its burden.

### 4.   Conclusion

The government has failed to prove beyond a reasonable doubt that (1) Mr. El Naddaf knew he was engaged in a financial transaction; and (2) Mr. El Nadaff was either knowingly involved in or willfully blind to a money laundering conspiracy concerning illicit funds.  Accordingly, I conclude the evidence presented to the jury did not support a conviction for conspiring to launder monetary instruments and will order Mr. El Naddaf acquitted pursuant to both FED. R. CRIM. P. 29(a) & (c).

### III. MOTION TO DISMISS SUPERSEDING INDICTMENT

As an alternative ground to terminate this prosecution, Mr. El Naddaf continues pressing his motion for dismissal of the

superseding indictment, contending that the government violated his Sixth Amendment right to a speedy trial.

At the outset of addressing this motion and to frame its consideration, I observe that while the sealed indictment initially returned against Mr. El Naddaf on September 26, 2013 was unsealed on July 16, 2014, and the superseding indictment on which he was tried was actually returned unsealed on December 10, 2014, as more fully detailed *supra* Section I.C., the government took no steps to make Mr. El Naddaf aware of the charges against him until his arrest on June 4, 2018.  He was thus arrested over six years after his alleged conduct on April 12, 2012 and approximately fifty-six months after he was initially indicted.  At that point, the charging documents had been publicly available on this court's docket for just short of four years.

### A.    *Sixth Amendment Right to a Speedy Trial*

The Sixth Amendment protects a defendant's right to a prompt resolution of criminal charges against him by providing "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ."  U.S. CONST. amend VI.  The right to a speedy trial "is one of the most basic rights preserved by our Constitution."  *Klopfer* v. *North Carolina*, 386 U.S. 213, 226 (1967).  This fundamental constitutional

protection recognizes "the general concern that all accused persons be treated according to decent and fair procedures." *Barker* v. *Wingo*, 407 U.S. 514, 519 (1972).[12]

---

[12] In addition to the constitutional protections provided by the Sixth Amendment, Congress has established separate statutory speedy trial requirements in the Speedy Trial Act, 18 U.S.C. § 3161(c)(1).  Mr. El Naddaf has not raised a violation of the Speedy Trial Act in any of his pre- or post-trial motions and memoranda to dismiss for violation of the Sixth Amendment.  A Sixth Amendment speedy trial violation can exist independently of a violation under the Act.  "That there [i]s no violation of the [Act] in [a] case does not necessarily preclude a court from finding a violation of [the defendant's] Sixth Amendment right to a speedy trial." *United States* v. *Muñoz-Amado*, 182 F.3d 57, 61 (1st Cir. 1999) "No provision of [the Speedy Trial Act] shall be interpreted as a bar to any claim of denial of speedy trial as required by amendment VI of the Constitution."  18 U.S.C. § 3173.  However, to situate the issues and questions of law now before me, I will briefly describe the contours and purpose of the Act.

  Congress enacted this statute not simply to codify certain constitutional protections afforded to defendants under the Sixth Amendment, but "to protect and promote speedy trial interests that go beyond the rights of the defendant." *Zedner* v. *United States*, 547 U.S. 489, 501 (2006) (quoting S. Rep. No. 96-212, at 29 (1979)).  This codification reflects the determination that "although the Sixth Amendment recognizes a societal interest in prompt dispositions, it primarily safeguards the defendant's speedy trial right—which may or may not be in accord with society's."  *Id.* (quoting S. Rep. No. 96-212, at 29).

  The Act establishes more "mechanical" statutory rules, *United States* v. *Lewis*, 732 F.3d 6, 12 (1st Cir. 2013), which provide that "the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs," 18 U.S.C. § 3161(c)(1).  "Sanctions for governmental non-compliance with §

As the Supreme Court has explained, the Sixth Amendment speedy trial right is "generically different from any of the other rights enshrined in the Constitution for the protection of the accused." *Id.* The Sixth Amendment implicitly recognizes that pretrial delays "might result in witness unavailability and fading memories, which may prejudice both defendants and prosecutors." *United States* v. *Handa*, 892 F.3d 95, 101 (1st Cir. 2018) (citing *Barker*, 407 U.S. at 521). But the constitutional right to a speedy trial must also be read to "promote the interests of rehabilitation, minimize the amount of time potentially dangerous individuals are free on bond, prevent oppressive pretrial incarceration, minimize anxiety and concern of the accused, and shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *Id.* (internal quotations omitted) (citing *Barker*, 407 U.S. at 519-32 and *United States* v. *Loud Hawk*, 474 U.S. 302, 311 (1986)).

In determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, I am directed to engage in an "ad hoc" balancing test involving the following factors set out by the Supreme Court in *Barker*: "Length of delay, the reason

---

3161's statutory deadlines include dismissal of charges for overdue indictments and case dismissal for delayed trials." *United States* v. *Reyes*, 24 F.4th 1, 27 (1st Cir. 2022).

for the delay, the defendant's assertion of his right, and prejudice to the defendant."  407 U.S. at 530.  The First Circuit cautioned some thirty years ago that "[t]hese factors cannot be plugged into a formula that operates with scientific precision.  Rather they must be considered on a case-by-case basis 'together with such other circumstances as may be relevant.'"  *United States* v. *Mala*, 7 F.3d 1058, 1061 (1st Cir. 1993) (quoting *Barker*, 407 U.S. at 533).

    1.  Length of Delay

    Length of delay analysis requires a "double enquiry," *Doggett* v. *United States*, 505 U.S. 647, 651-52 (1992), because it is both a "triggering mechanism for the rest of the [speedy trial] analysis, and *a* factor in that analysis,"  *Handa*, 892 F.3d at 101 (alteration in original) (emphasis added) (quoting *United States* v. *Carpenter*, 781 F.3d 599, 609 (1st Cir. 2015)).

    To establish at the outset that a speedy trial inquiry is necessary, "a defendant must allege that the time between accusation — whether by arrest or indictment — and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay."  *Handa*, 892 F.3d at 101 (internal quotation marks omitted) (quoting *United States* v. *Irizarry-Colón*, 848 F.3d 61, 68 (1st Cir. 2017)).  The First Circuit has held that a "[d]elay of around one year is considered presumptively

prejudicial, and the presumption that delay prejudices the defendant 'intensifies over time.'" *Carpenter*, 781 F.3d at 610 (quoting *Doggett*, 505 U.S. at 652)[13].  For *Barker* factor one purposes, the delay period is calculated using the date that the defendant is "indicted, arrested, or otherwise officially accused" as its start date.  *United States* v. *MacDonald*, 456 U.S. 1, 6 (1982).

Thus, the clock presumptively began to tick for Mr. El Naddaf on September 26, 2013, when the initial sealed indictment issued.  *See Handa*, 892 F.3d at 101-07.  In the particular circumstances of this case, the delay period then ended no more than four years and eight months later when Mr. El Naddaf was arrested on June 4, 2018 at Boston Logan International Airport.[14] This nearly five years of delay between Mr. El Naddaf's indictment and arrest is prejudicial for purposes of this stage of analysis.  *Handa*, 892 F.3d at 102.

---

[13] Although one year may raise a presumption of prejudicial delay, it "does not necessarily indicate a statistical probability of prejudice" as considered in the fourth factor of the *Barker* v. *Wingo*, 407 U.S. 514 (1972), Sixth Amendment analysis.  *Doggett* v. *United States*, 505 U.S. 647, 652 n.1 (1992).  Rather, a one-year delay "marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry."  *Id.*
[14] The government concedes that this is the relevant period regarding the first *Barker* factor for the constitutional speedy trial analysis in this case.

Once a defendant has established presumptively prejudicial delay, he becomes entitled to a full speedy trial inquiry, and the court must analyze "as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Irizarry-Colón*, 848 F.3d at 68 (quoting *Doggett*, 505 U.S. at 652).  The weight attributed to a period of significant delay "depends upon the extent to which the delay exceeds the bare minimum considered presumptively prejudicial." *United States* v. *Muñoz-Amado*, 182 F.3d 57, 62 (1st Cir. 1999) (observing that the nineteen-month delay preceding commencement of defendant's trial "was long enough to tip the scales slightly in favor of [defendant]'s claim" in a "case more complicated than an ordinary street crime but less so than a serious, complex conspiracy charge" (internal quotations and citation omitted)).

The extended delay as to Mr. El Naddaf "tip[s] the scales" substantially in his favor regarding the first *Barker* factor. *Id.*  While the overall conspiracy, for which Mr. El Naddaf was charged for his alleged drive-through role could otherwise be characterized as complex, there was no evidentiary complexity in this matter as to his alleged participation.  From all that appears from the trial record, Mr. El Naddaf's role involved work as a courier on one occasion.  These allegations do not

present the kind of complexity justifying the significant delay before he was brought to trial.

### 2.   Reason for the Delay

The reason for the delay is generally considered the "focal inquiry" of constitutional speedy trial analysis. *Id.* (quoting *United States* v. *Santiago-Becerril*, 130 F.3d 11, 22 (1st Cir. 1997)).

I consider fundamental whether the delay is attributable to conduct of the government or the defendant. *See United States* v. *Souza*, 749 F.3d 74, 82 (1st Cir. 2014). Delay resulting from the defendant's own conduct will weigh against his speedy trial challenge. *Vermont* v. *Brillon*, 556 U.S. 81, 90 (2009). And beyond encouraging an evaluation regarding which party is more culpable, the Supreme Court has also directed that "different weights should be assigned to different reasons" offered by a party for delay. *Barker*, 407 U.S. at 531. It is well-established, for example, that a delay attributable to "prosecutorial negligence carries less weight in the speedy trial analysis" than delay attributable to the government's bad faith or deliberate efforts to thwart the defense. *United States* v. *Perez-Cubertier*, 958 F.3d 81, 90 (1st Cir. 2020) (per curiam).

The First Circuit has characterized "[t]he inquiry into causation [as] a sliding scale: deliberately dilatory tactics must be weighed more heavily against the state than periods of delay resulting from negligence.  By like token, to the extent that valid reasons cause delay, the delay does not count against the state at all."  *Rashad* v. *Walsh*, 300 F.3d 27, 34 (1st Cir. 2002) (citations omitted); *see United States* v. *Reyes*, 24 F.4th 1, 29 (1st Cir. 2022).

In any event, the government has an affirmative obligation to undertake trial of a defendant in a timely manner, "with reasonable diligence from his indictment to his arrest." *Doggett*, 505 U.S. at 656; *cf. United States* v. *Graham*, 128 F.3d 372, 374 (6th Cir. 1997) (explaining that the government has an "affirmative constitutional obligation to try the defendant in a timely manner" (internal quotations and citation omitted)).  The government's failure to undertake available efforts to bring a defendant to trial promptly will weigh against it in speedy trial analysis, at least to some extent.  *See Doggett*, 505 U.S. at 656; *see also United States* v. *Handa*, 266 F. Supp. 3d 443, 448 (D. Mass. 2017) ("'[R]easonable diligence'" demands 'serious effort[s].'" (alteration in original) (quoting *Doggett*, 505 U.S. at 652, 656)).

a.   *Special Considerations for Defendants Residing Abroad*

The circumstance of the indictment of a defendant residing outside the United States, in particular, must be closely examined, because delays in bringing such a defendant to justice may occur almost as a matter of course.  In such a case, certain courts have held "the hallmark of government diligence is extradition." *United States* v. *Fernandes*, 618 F. Supp. 2d 62, 69 (D.D.C. 2009).

In this connection, the Circuits have adopted differing standards as to what efforts the government must demonstrate regarding its attempts to bring a defendant into custody in order to satisfy its obligation of reasonable diligence.  The Second, Ninth and Eleventh Circuits, for example, have essentially held that "where our government has a good faith belief supported by substantial evidence that seeking extradition from a foreign country would be futile, due diligence does not require our government to do so." *United States* v. *Corona-Verbera*, 509 F.3d 1105, 1114 (9th Cir. 2007); *see United States* v. *Blanco*, 861 F.2d 773, 778 (2d Cir. 1988); *United States* v. *Bagga*, 782 F.2d 1541, 1543-44 (11th Cir. 1986); *see also United States* v. *Ansari*, 48 F.4th 393, 398-400 (5th Cir. 2022) (describing diligent government efforts to bring

53

defendant to United States and notify him of indictment, despite "well-founded belief" that defendant was residing, at times, in Iran and the United Arab Emirates, which are not parties to extradition treaties with the United States, prior to ultimate extradition); *United States* v. *Tchibassa*, 452 F.3d 918, 924-96 (D.C. Cir. 2006) (cable to the Embassy in a country with an extradition treaty in force requesting to no avail that the foreign government effect defendant's arrest — even though the prosecution "might have undertaken more frequent and extensive efforts to secure [defendant]'s arrest" — led court to conclude that the primary fault for the delay in arrest was born by defendant because it was "attributable primarily to his continued residence in an area over which the United States had no control and little influence").

Separately, the Sixth, Seventh, and Ninth Circuits, have emphasized the core obligation of the government to assure that the defendant is aware of charges pending against him irrespective of whether extradition appears a fruitful way to bring the defendant into custody.  *See United States* v. *Heshelman*, 521 F. App'x 501, 506 (6th Cir. 2013) ("When the defendant knows about the charges and actively seeks to evade detection, the government is permitted to expend less effort to locate the defendant.  However, if a defendant is unaware of the

indictment, the government's burden is higher." (citation
omitted)); *In re Kashamu*, 769 F.3d 490, 494 (7th Cir. 2014)[15];
*United States* v. *Mendoza*, 530 F.3d 758, 763-64 (9th Cir. 2008),
*see also* 766-67 (Bybee, J., concurring).

The government contends here that, because it believed an
extradition attempt would have been futile, it should not be
held responsible for the years of delay between Mr. El Naddaf's
indictment and arrest.  The government represents there is no
extradition treaty between Lebanon and the United States and it
believed that Lebanon would refuse to extradite a Lebanese
citizen, despite Mr. El Naddaf's dual status as a United States
citizen.[16]

The First Circuit has yet to address directly the
circumstance before me, in which the government maintains that

---

[15] In *Kashamu*, Judge Posner writing for the Court questioned
whether "the government ever must try to extradite a fugitive so
as to protect his right to a speedy trial," but also explained,
more fundamentally, that the government must make a defendant
aware of charges against him in the United States; at that
point, he has thus been "warned, [and] it's his choice whether
to face the judicial music in the United States or forgo any
speedy-trial right based on the time he spends out of the reach
of our court system."  769 F.3d 490, 494 (7th Cir. 2014).
[16] The government tendered an affidavit from Tom Heinemann,
Assistant Legal Advisor for Law Enforcement and Intelligence in
the Office of the Legal Adviser of the United States Department
of State, stating that although "the Lebanese Criminal Code does
permit extradition even in the absence of a treaty in some
circumstances, . . . Article 32 of the Lebanese Criminal Code
prohibits the extradition of Lebanese nationals.

extradition would have been futile but nevertheless made no attempts to inform a defendant of the indictment against him or pursue his arrest, should he travel to a country with an extradition treaty.  I note and join those of my colleagues on this Court who have rejected such a "wait-and-see" strategy. *Heshelman*, 521 F. App'x at 506.  As Judge Zobel observed in a case in which she granted a speedy trial challenge, "the government cannot be credited with undertaking any serious efforts to pursue the case . . . . [when] it waited until defendant returned to this country—almost three years after its last attempt—to arrest him."  *See Handa*, 266 F. Supp. 3d at 448. Judge Tauro made the same point forty years earlier in 1977 when he observed "[t]hat [a foreign nation] may not honor an extradition request is no excuse for failing to make one.  'The possibility of a refusal is not the equivalent of asking and receiving a rebuff.'"  *United States* v. *Rowbotham*, 430 F. Supp. 1254, 1257 (D. Mass. 1977) (quoting *Smith* v. *Hooey*, 393 U.S. 374, 382 (1969)).

More is required of the government to demonstrate its reasonable diligence in this circumstance than its assertion that extradition would likely be futile where, as here, the defendant was, by all accounts, unaware that he had been indicted.  The prospect of extradition on the particular facts

of this case is, in fact, beside the point.  Consular officials

of the government could have warned Mr. El Naddaf that he was

facing prosecution at any point in which he appeared at the

Beirut Embassy, but did not do so.  This was assertedly because

they were not prompted to do so by the relevant investigating

agencies and/or believed they could not complete an arrest on

embassy grounds without the consent of Lebanon at risk of

prompting Lebanon to view the action as a violation of its

sovereignty.

In this connection, I find the guidance from the Sixth,

Seventh, and Ninth Circuit case law regarding the government's

duty, when possible, to inform a defendant abroad of the charges

against him to be instructive.  Here, the government should

have, at the minimum, attempted to reach Mr. El Naddaf to put

him on notice of the charge against him and allow him to return

to the United States to face it.  This is neither a case in

which a defendant fled the country to avoid prosecution nor one

in which a fugitive in exile took pains to disappear.  It is

undisputed there were no charges pending against Mr. El Naddaf

when he left the United States, and he openly lived in Lebanon

thereafter.  Mr. El Naddaf registered with the United States

Embassy in Beirut as a U.S. citizen living in Lebanon in 2013,

and he subsequently visited the United States Embassy on at

least two other occasions.  Yet, there is no evidence in the record before me that the government ever attempted to contact Mr. El Naddaf while he lived openly in Lebanon.

The government seems to suggest, secondarily, that any attempt even to contact Mr. El Naddaf would be futile as "there was no reason for law enforcement to assume that a general notification would cause the Defendant to leave his home and family and travel to the United States to be placed under arrest."

Again, this is beside the point.  Absent countervailing considerations, such as a continuing investigation that would be compromised by premature disclosure of outstanding charges, the government should be incentivized to warn defendants of open and unsealed charges or risk diminished weight for its justification on the "reason for delay" prong of the *Barker* balancing test.

In the absence of well-founded countervailing considerations, a defendant's constitutional rights do not hinge on the government's assumptions as to what a defendant will do with knowledge of the pending charges against him.  A defendant should be given the opportunity to return to face the charges against him, rather than being remitted to the consequences of a

unilateral decision by the government simply to wait for his

return.  *See In re Kashamu*, 769 F.3d at 494.[17]

       *b.   Conclusion*

Because it did not put Mr. El Naddaf on notice of the

charge against him, the government cannot be said to have been

duly diligent in this circumstance.  Accordingly, I find that

the delay is on balance attributable to the government.

The First Circuit has recognized that "[m]ore neutral

reasons for delay, such as overcrowded courts or the

prosecution's negligence in not bringing the case to trial, are

to be counted against the government, since the ultimate

responsibility for such circumstances rests there," even if

---

[17] The government further contends that requiring it to contact a
defendant "outside of a legal or diplomatic process, would
devolve into situations not governed by a definitive process but
upon a notification or contact."  I am skeptical that, as a
general matter, the obligation to provide notice to a defendant
abroad when possible, is too ambiguous or unduly onerous for the
government to meet.  In this case, for example, the record
reflects that since June 2013 the government would have had
access to contact information voluntarily provided by Mr. El
Naddaf to the United States Embassy, including his home address
in Lebanon, his home phone number, his mobile phone number, and
his home email address.

  The government's argument is further undermined by its own
failure to make use of an apparently available diplomatic
channel to contact Mr. El Naddaf.  If the government was truly
concerned about the use of diplomatic process, it could have
made use of the United States Embassy to contact Mr. El Naddaf,
as it is undisputed Mr. El Naddaf openly visited and registered
there as a United States citizen.  It made no attempt to do so.

those circumstances are to be "weighed less heavily." *United States* v. *Johnson*, 579 F.2d 122, 123 (1st Cir. 1978).  Giving the government the benefit of a calculation which, in the particular circumstances of this case, does not begin to run until lack of danger regarding compromise to any ongoing investigation is established by the unsealing of the charges on the public docket, the relevant period of delay attributable to the government is just short of *four* years.

The delay caused by the government's failure to act with due diligence to extradite or contact Mr. El Naddaf does not appear to have been a knowing attempt to undermine the defense. The record contains no evidence to suggest that the government acted deliberately to gain advantage.  Because the delay resulted coincidentally from the government's "wait-and-see" strategy, I find that although this factor cuts in favor of the defendant's speedy trial challenge, it does not do so decisively.

### 3.   Defendant's Assertion of His Right

It is well-established that "[a] defendant cannot invoke his right to a speedy trial until he knows that criminal charges have been filed." *Handa*, 266 F. Supp. 3d at 448.  Mr. El Naddaf states in his sworn affidavit that he only learned about the charge after being arrested.  The government presents no

evidence to the contrary.  I find that Mr. El Naddaf remained
unaware of the charge until he was arrested on June 4, 2018.  I
conclude, therefore, that Mr. El Naddaf's assertion of his right
to a speedy trial in his motion to dismiss filed on July 29,
2018, just over a month after his arrest, was as timely and
expeditious as could be expected under circumstances
orchestrated at most indifferently by the government.

### 4.   Prejudice to the Defendant

Under the fourth factor of *Barker*, examination includes, in
part, length of delay as prejudice previously encountered at the
outset of the *Barker* analysis in the first factor.  The analysis
of the fourth factor, however, is inflected with a recognition
at this stage that "[a] defendant can establish prejudice by two
different means: (1) a presumption of prejudice, or (2) specific
[or actual] evidence of prejudice."  *United States* v. *Muhtorov*,
20 F.4th 558, 653 (10th Cir. 2021), *cert. denied*, 143 S. Ct. 246
(mem.) (2022).[18]  Although Mr. El Naddaf — as I find *infra*

---

[18] Some courts, including the First Circuit, refer to "actual"
rather than "specific" prejudice.  *See Rashad* v. *Walsh*, 300 F.3d
27, 41-42 (1st Cir. 2002).  My review of the case law suggests
that "actual" or "specific" (and other synonyms) are used to
refer to tangibly identifiable instances of prejudice caused by
delay.  *Compare id*. at 41 ("*Doggett* establishes that, when the
pretrial delay is grossly excessive, the fourth *Barker* factor
can tilt in the defendant's favor even though no showing of
actual prejudice has been made."), *with United States* v. *Handa*,

Section III.A.4.a. — has not demonstrated specific or actual
prejudice as such, I find that he has established presumptive
prejudice.  On the facts as presented here, that form of
prejudice, however, again does not alone weigh decisively in the
balancing of the *Barker* factors.

   *a.   Specific or Actual Prejudice*

  Specific prejudice considers the actual harms to the
defendant resulting from the delay between indictment and trial,
"including 'oppressive pretrial incarceration,' 'anxiety and
concern of the accused,' and 'the possibility that the
[accused's] defense will be impaired' by dimming memories and
loss of exculpatory evidence." *Doggett*, 505 U.S. at 654
(alteration in original) (quoting *Barker*, 407 U.S. at 532); *see*
*Perez-Cubertier*, 958 F.3d at 91.  "Of these forms of prejudice,
'the most serious is the last, because the inability of a
defendant adequately to prepare his case skews the fairness of
the entire system.'"  *Doggett*, 505 U.S. at 654 (quoting *Barker*,
407 U.S. at 532).  The defendant who asserts he was actually
prejudiced by pretrial delay has the burden "of alleging and
proving specific ways in which the delay attributable to the

_____

266 F. Supp. 3d 443, 448 (D. Mass. 2017) ("Specific prejudice,
however, is required only if the government proceeded with
reasonable diligence . . . ." (internal quotations and citation
omitted)).

[government] unfairly compromised his ability to defend himself." *Reyes*, 24 F.4th at 30 (alteration in original) (quoting *Rashad*, 300 F.3d at 34).

Mr. El Naddaf was neither incarcerated nor aware of the charges against him until his arrest in June 2018. As a result, the harms of oppressive pretrial incarceration and anxiety need not be analyzed further.

That leaves the question of prejudice to Mr. El Naddaf's trial defense. I turn now to evaluate whether and how Mr. El Naddaf's ability to defend himself may have been impaired in specific ways as a result of the government's delay. Mr. El Naddaf makes, at best, conclusory contentions that his ability to prepare his defense was impaired. Despite Mr. El Naddaf's affidavit attesting to his lack of memory regarding the events underlying the matter before me, and his counsel's argument regarding its effect on his ability to assist in his defense after presiding over the trial, I have found no such evidence of any specific prejudice.[19] *Cf. United States* v. *Jones*, 555 F.

---

[19] I delayed ruling on Mr. El Naddaf's motion for a speedy trial until after his trial so that I could assess, in light of the evidence adduced, whether he suffered any cognizable prejudice in presenting his defense (i.e., unavailable witnesses or witnesses having poor memories of events). In addition to being unable to provide evidence of relevant memory loss, Mr. El Naddaf does not claim that any exculpatory physical evidence was

App'x 485, 489 (6th Cir. 2014) ("Other than his affidavit
. . . [defendant] presented no other evidence to confirm or
explain the exculpatory content of such records.  His
generalized assertion that these records are essential to his
defense fails the specificity inquiry.").  As a result, Mr. El
Naddaf has not established specific or actual prejudice under
the fourth prong of *Barker*.  *See Muñoz-Amado*, 182 F.3d at 63
("There is no indication here that the period of pretrial delay
interfered in any way with [defendant]'s ability to present
evidence or obtain the testimony of witnesses, or that it had
any impact on the fairness of his trial.").

       *b.  Presumptive Prejudice*

      The Supreme Court, in *Doggett*, explained that "affirmative
proof of particularized prejudice is not essential to every
speedy trial claim" because "excessive delay *presumptively*

---

lost as a result of delay in arresting him.  Even if Mr. El
Naddaf were to claim that the destruction of the box containing
the funds at issue amounted to prejudice, that development in
the case provided a form of prejudice during a time period, i.e.
before he was either charged or arrested, that mark the
triggering mechanisms for commencement of constitutional speedy
trial protections.  The government apparently destroyed the box
soon after its seizure in 2012 well before the original
indictment was handed down.  Such prejudice as resulted from the
government's self-spoliation of its evidence, where Mr. El
Naddaf's handling of the box was not in dispute, fell upon the
government which did not, because it was unable to, adduce
evidence of handling of the subject funds and its packaging by
Mr. El Naddaf.

compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify."  505 U.S. at 655-56 (emphasis added).  In other words, even if a defendant cannot point to specifics regarding the impact of the delay upon his defense, he may establish prejudice based on its sheer length.

However, unlike the first prong of *Barker*, which presumes prejudice after one year, a presumption of prejudice at the fourth prong requires a longer delay and is not consistently applied across the Circuits. *See United States* v. *Jackson*, 473 F.3d 660, 664-65 (6th Cir. 2007) (warning against "conflat[ing] the first (presumptive-prejudice) and fourth (actual-prejudice) prongs"); *see also Heshelman*, 521 F. App'x at 510 (determining that a three-year delay, caused by the government's failure to extradite the defendant, "warrant[ed] a presumption of prejudice"); *United States* v. *Duran-Gomez*, 984 F.3d 366, 379 (5th Cir. 2020) ("[D]elay longer than five years g[ives] rise to the presumption of prejudice, when at least five years of the case's total delay is due to the government's negligence or bad faith and the defendant asserted his speedy trial right."); *Muhtorov*, 20 F.4th at 653 (requiring six years of delay attributed to government to trigger presumptive prejudice).

My colleague, Judge Zobel has determined that a "nearly six-year post-indictment delay following nearly four years after the alleged criminal conduct" was sufficient to establish presumptive prejudice that the government could not rebut, *Handa*, 266 F. Supp. 3d at 448-49; *see also Rashad*, 300 F.3d at 34 ("In aggravated cases, involving grossly excessive delay, prejudice may be presumed despite the defendant's inability to identify particular testimony or evidence that has become unavailable due to the passage of time."), though the First Circuit has declined to find presumptive prejudice for a "roughly thirty-three month delay," *United States* v. *Benjamin-Hernandez*, 49 F.4th 580, 585-87 (1st Cir. 2022).[20]

---

[20] In another recent Sixth Amendment speedy trial case, *United States* v. *Maldonado-Peña*, the First Circuit ultimately affirmed the District Court's denial of the defendants' constitutional claim, noting that the defendants failed to timely assert their rights and in fact contributed to the lengthy delay.  4 F.4th 1, 18 (1st Cir. 2021).  However, when assessing whether the defendants established presumptive prejudice under the fourth prong of *Barker*, the First Circuit explained that a "five-year gap between the indictment and the start of trial does not sit well with us."  *Id.*  Given the length of time, "[e]ven though the defendants made no showing of how their defenses were actually impacted by the delay, at the very least witnesses' memories would have dulled and faded over that time."  *Id.* at 19.

Although the form of the presumptive prejudice inquiry varies among the Circuits,[21] some consistencies emerge.  First, for the delay to weigh in favor of the defendant at the fourth stage, it must be, to some degree, caused by the government. *See Corona-Verbera*, 509 F.3d at 1116 ("If the government pursued [the defendant] 'with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail' unless [the defendant] can show 'specific prejudice to his defense.'" (quoting *Doggett*, 505 U.S. at 656)); *Handa*, 266 F. Supp. 3d at 448 ("Specific prejudice, however, is required only if the government proceeded with reasonable diligence . . . ." (internal quotations and citation omitted)).  Second, presumptive prejudice, standing alone, is insufficient to "carry a Sixth Amendment claim without regard to the other *Barker* criteria."  *Doggett*, 505 U.S. at 656.

---

[21] For example, the Third Circuit apparently considers presumptive prejudice *within* the third form of specific prejudice, "any impairment of a defense at trial."  *Kennedy* v. *Superintendent Dallas SCI*, 50 F.4th 377, 385 (3d Cir. 2022).  However, the principles underlying the Third Circuit's analysis are the same as other Circuits: "Presumptive prejudice can be mitigated by a showing that the defendant acquiesced in the delay, or can be rebutted if the Government affirmatively prove[s] that the delay left [the defendant's] ability to defend himself unimpaired."  *Id.* (alterations in original) (internal quotations and citations omitted).

The length of relevant delay at this stage is the approximately four years between the initial unsealing of the charges (July 16, 2014) and Mr. El Nadaff's arrest (June 14, 2018),[22] which I find to be "excessive" within the meaning of *Doggett*.  Though the delay here is not due to the government's demonstrated bad faith, the government's failure to act diligently to contact Mr. El Naddaf to make him aware of the charges against him is the root cause of the delay.

Under these circumstances, where Mr. El Naddaf is not at fault for the delay calculated at this stage to be nearly four years, I find that he has established presumptive prejudice. Although I did not find Mr. El Naddaf's conclusory attestations

---

[22] I note that the First Circuit in *Handa* reported that it would "deem the end date for purposes of measuring the length of delay to be the district court's dismissal of the" charge there at issue.  *Handa*, 892 F. 3d at 102 n. 2.  This choice of duration, resulting in the calculation of a six-and-a-half year delay, triggered not only the speedy trial inquiry at the first stage but also created "a strong presumption of prejudice to [the defendant] under the fourth *Barker* factor."  I do not apply the same end date for measurement of duration here, since the trial of Mr. El Naddaf took place less than a year after his arrest and the dismissal in this case has resulted in a judgment of acquittal after a completed trial.  That acquittal bars this case from retrial.  *See generally United States* v. *Martin Linen Supply Co.*, 430 U.S. 564 (1977).  Nevertheless, in the interest of completeness, I record here my own finding, in the particular context of this case, that the appropriately calculated duration of relevant delay here — just short of four years — is, as I observe in the text above, still "excessive within the meaning of *Doggett*" at the fourth stage.

68

regarding his faded memory to be compelling specific evidence of prejudice, "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655.  Under these circumstances, I also find that the government has not rebutted[23] the presumption of prejudice and the fourth *Barker*

---

[23] In *Doggett* v. *United States*, the Supreme Court twice cited a law review article as instructive, H. Richard Uviller, Barker v. Wingo*: Speedy Trial Gets a Fast Shuffle*, 72 COLUM. L. REV. 1376 (1972)*.  See Doggett* v. *United States*, 505 U.S. 647, 652 n.1 & 658 n.4 (1992).  There, Professor Uviller explored, *inter alia*, the "[r]ealistic[]" application of prejudice in the *Barker* analysis, explaining that "prejudice lies beyond the capacity of either side to prove or disprove, except in the rare instance where a known defense witness of known competence actually disappears or reports a recent impairment of memory, and no prior testimony from him is available."  Uviller, *supra*, at 1394-95.  As a result, "the shift of burden actually permits the presumption of prejudice to prevail on the issue," though "[t]he establishment of [presumptive] prejudice . . . does not end the inquiry; it merely focuses attention on other elements wherein impropriety or justification may be more meaningfully discerned."  *Id.* at 1395.
   Judge Lipez, a First Circuit judge sitting by designation on the Third Circuit "note[d] that, in citing the . . . [Uviller] passage for support, the *Doggett* Court was keenly aware of the practical difficulties for the prosecution in making such a rebuttal."  *United States* v. *Velazquez*, 749 F.3d 161, 185 n.23 (3d Cir. 2014).  In fact, "[t]he [Supreme] Court [in *Doggett*] thus indicated that the government faces a high, and potentially insurmountable, hurdle in seeking to disprove general prejudice where the period of delay is extraordinarily long."  *Id.* at 185.  Although I have concluded Mr. El Naddaf did not establish specific prejudice, I conclude the government has failed to rebut the inherent prejudice of a nearly five-year delay, during which no steps were taken to make Mr. El Naddaf aware of the charges against him.

factor favors Mr. El Naddaf, though again not on its own decisively.

At the first stage of *Barker* v. *Wingo* analysis as directed by *Doggett*, length of delay is described as requiring a "double enquiry" regarding prejudice, functioning both as a triggering mechanism for and a factor in that analysis. *United States* v. *Sousa*, 749 F. 3d 74, 81 (1st Cir. 2014). At the fourth stage, length of delay may fairly be described as doing "double duty." Although the overlapping use of terms connoting "prejudicial delay" can obscure analysis, it is apparent they are meant to convey distinct meanings at the first and the fourth stages. At the fourth stage such delay prejudice again becomes a factor but not a conclusive one in analysis. When it is sufficiently significant it can again give rise to presumptive prejudice that can affect the balance among the several *Barker* factors. I now turn to conclude that balancing exercise.

---

I further note that in sitting by designation on the Third Circuit, Judge Lipez deployed a somewhat different standard of review formulation from the one applied by the First Circuit, which has "repeatedly reviewed district court rulings for abuse of discretion," *United States* v. *Carpenter*, 781 F.3d 599, 607 (1st Cir. 2015). This formulation "varies from that used in most other circuits," including the Third Circuit in *Velazquez*, "which review such claims de novo, albeit while applying clear error review to the district court's factual findings." *Id.* The different formulations do not appear to be material for purposes of my own responsibilities for nisi prius analysis in this case.

**B.   Balance of the *Barker* Factors**

Here, each of the four *Barker* factors in varying degrees weighs in favor of finding a violation of Mr. El Naddaf's Sixth Amendment right to a speedy trial.   Together, they overcome the hurdles *Doggett* identified for a defendant to surmount in establishing a speedy trial claim.   It is inadequate to leave matters in this case with the observation that "the delay was unfortunate, [but] it did not impair the defense, create any undue pressure, or result in any period of incarceration." *Carpenter*, 781 F.3d at 615.   The delay here did something more enervating; it deprived the defendant of his fundamental constitutional right to a speedy and public trial.   Accordingly, I will grant Mr. El Naddaf's motion to dismiss the indictment for violation of his Sixth Amendment right to a speedy trial.

Having conducted a full four factor *Barker* analysis as directed by *Doggett* and governing First Circuit law shaped by the Supreme Court's modern cautious, step-by-step and ad hoc approach to addressing constitutional speedy trial claims,[24] I am

---

[24] When it embarked on the development of a contemporary jurisprudence for the constitutional speedy trial right with *Barker*, 407 U.S. at 514, following a lengthy initial period in which the "Court ha[d] dealt with that right on infrequent occasions," *id.* at 515, the Supreme Court candidly observed that it was commencing an attempt "to set out the criteria by which the speedy trial right is to be judged," *id.* at 516.

not unaware of the tensions created by the interests at play. That constitutional protections are principally directed at securing for an accused the right to a speedy and public trial. That constitutional provision also serves to secure for the community a speedy and public resolution of criminal charges. *See generally Barker*, 407 U.S. at 519 (the interests are "at times in opposition").  In a setting in which the adjustment and accommodation of those separate but fundamental interests turns meaningfully on the question of prejudice, a full and nuanced analysis of prejudice cannot always be made without the evidence provided by a trial.  *Id.* at 522 (observing the speedy trial right is "slippery").  Yet the decision to move the case to trial deprives the defendant of the right to avoid trial altogether when his speedy trial rights have been breached.  In addressing the issues in this case, I was impelled by the conclusion that a meaningful balancing test here required such a trial.  With the benefit of the full record it created, I am satisfied that Mr. El Naddaf has been deprived of his constitutional speedy trial rights and that this deprivation provides an alternative ground for a judgment terminating this case.

## IV. CONCLUSION

For the foregoing reasons, Mr. El Naddaf's motion [Dkt. No. 292] pursuant to FED. R. CRIM. P. 29(c) for renewal of his motion for judgment of acquittal after discharge of the jury is GRANTED and his motion [Dkt. No. 273] pursuant to FED. R. CRIM. P. 29(a) for directed verdict, having been reserved pursuant to FED. R. CRIM. P. 29(b) before submission to the jury, is also GRANTED. In addition, Mr. El Naddaf's motion [Dkt. No. 203] to dismiss for violation of his Sixth Amendment speedy trial right is GRANTED.  The Clerk is directed to enter a judgment of acquittal forthwith.

As relevant to my obligation to determine whether a new trial should be granted as a result of any appeal initiative from this judgment, *see* FED. R. CRIM. P. 29(d), I am satisfied that no conceivable set of circumstances would justify a new trial pursuant to FED. R. CRIM. P. 29(d) or otherwise. Irrespective of whether the question of a constitutional speedy trial violation has been wrongly decided, the Double Jeopardy Clause bars the government from both appellate review and the remedy of retrial following the Judgment of Acquittal I am entering as one alternative ground for this decision.  *See generally United States* v. *Martin Linen Supply Co.*, 430 U.S. 564 (1977).  The defendant for his part has no final judgment of

conviction from which he may appeal even if for some

inexplicable reason he might seek to do so.


**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE